Filed 1/15/14  P. v. Gaona CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B240908 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA347261) |
| v. | |
| NICHOLAS GAONA and ALVARO JAVIER RAMIREZ CARRERA, | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Craig E. Veals, Judge.  Reversed in part with directions and affirmed in part as to Gaona; modified and affirmed as to Carrera.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant Gaona.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant Carrera.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Colleen M. Tiedemann and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Nicholas Gaona and Alvaro Javier Ramirez Carrera appeal from judgments entered following a jury trial in which Gaona was convicted of four counts of conspiracy to transport cocaine (Pen. Code, § 182, subd. (a)(1)), four counts of transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)), and four counts of possession of cocaine for sale (Health & Saf. Code, § 11351), while Carrera was convicted of one count of each of the same three offenses.

Gaona contends the trial court erred by (1) denying his motion for a mistrial after jurors expressed security concerns, (2) failing to instruct the jury sua sponte that it could find one overall conspiracy to commit multiple crimes as an alternative to finding the four separate conspiracies it found, and (3) reducing the prosecution's burden of proof by instructing the jury on the preponderance of evidence standard. We agree that the trial court prejudicially erred by failing to instruct the jury, sua sponte, that it could find one overall conspiracy to commit multiple crimes as an alternative to finding the four separate conspiracies it found. A finding of a single overall conspiracy could have resulted in a shorter sentence for Gaona. Accordingly, we reverse as to Gaona due to instructional error.

Carrera joins in Gaona's contentions and separately contends that the trial court violated Penal Code section 654 by imposing concurrent sentences for his three convictions, which arose from the same criminal activities on the same day. The Attorney General concedes that Carrera's concurrent sentences for the same underlying criminal activities violated Penal Code section 654 and we agree. Therefore, we modify Carrera's sentence by staying the sentences on his transportation of cocaine and possession of cocaine for sale convictions.

We affirm in all other respects.

## BACKGROUND

With court authorization, a federal Drug Enforcement Administration task force wiretapped Gaona's mobile phone in the month of February 2008. (Undesignated date references pertain to 2008.) The task force included narcotics officers from various law

enforcement agencies throughout the greater Los Angeles area. Spanish-speaking wiretap monitors would alert the task force officers to the contents of Gaona's phone calls, and undercover task force officers would move into position to conduct surveillance at locations specified in Gaona's phone calls.

On four days in February of 2008, officers observed what they believed to be a delivery of drugs, moved in to detain select participants other than Gaona, and recovered large quantities of cocaine. The seizures on each of these four days led to the charges against Gaona and Carrera, with three charges arising from each seizure: conspiracy to transport cocaine, transportation of cocaine, and possession of cocaine for sale.

**1. Expert testimony regarding importation of narcotics from Mexico by criminal organizations**

Detective John Bur of the Glendora Police Department was a member of the task force and testified as one of the prosecution's experts on drug trafficking. He explained "the general structure of a drug trafficking organization" importing drugs from Mexico to California. According to Bur, "[T]here's always a source of supply in Mexico . . . ." The organization has a leader, who may also be the source of the narcotics. The leader "will have people that help him, lieutenants, if you will, or brokers that will go out and find customers. [¶] There's couriers that bring the narcotics across the border." "[C]ouriers typically will cross the border with a load of narcotics typically in a hidden compartment inside of a vehicle and then take it to a stash house." A stash house is a location where the narcotics are collected and stored, and each stash house has a manager.

Bur testified, "Not all couriers are allowed to see where the stash house is, so sometimes they have to meet with a go-between or the stash house manager will meet them. [¶] Sometimes there's a vehicle switch and so that the courier is left in a shopping center or someplace where they meet and they'll swap vehicles. And the stash house manager will take the vehicle and load it with the narcotics or collect the narcotics and load it with proceeds to go back down to Mexico." Couriers who are allowed to go to the stash house will obtain directions by phone from the stash house manager. "Oftentimes,

the courier will go to the location, pull inside the garage, and be inside the garage for anywhere from 10 to 30 minutes to an hour, sometimes two . . . .  And then the vehicle will leave and the drugs have been offloaded inside the stash house."

The "stash house manager will oftentimes have customers that he deals with.  And sometimes they have brokers that will find customers so that ultimately the narcotics will be passed on to the next person down the line and sold."

A drug trafficking organization may "branch out into other organizations."  Stash house managers may have multiple stash houses in different cities, and the customers of the different stash houses will have no relationship with one another.

Narcotics traffickers use "coded language" on the telephone, for example, "office" refers to a stash house,  "receipts" and "blueprints" mean narcotics proceeds,  "windows" is code for the narcotics themselves,  and an "installation" refers to a delivery of narcotics.

**2.      Testimony regarding the February 6 seizure (counts 1 through 3, Gaona)**

About 7:15 a.m. on February 6, Gaona spoke on his mobile phone to a man identified only as "Chino."  Gaona said he was near the "office" and was expecting to meet someone there at 7:00 a.m.  Chino said the meeting was at 9:00 a.m., and Gaona asked Chino to confirm it.

Gaona subsequently spoke by phone to "Japones," saying he was around the corner from Japones's "office."  Over the course of two calls, Japones told Gaona he was having difficulty reaching the man who could open up the "office."  Japones asked Gaona to "kill some time" and wait for his call.  Gaona confirmed to Japones he was "going to take the receipts today."

Several hours later, surveillance officers saw Gaona drove his gold Nissan Sentra to a house on Compton Avenue in Los Angeles, park along the street, and enter the house.  It later was discovered that the gold Nissan Sentra contained a secret storage compartment in which narcotics could be concealed.  While he was in the house, Gaona phoned Chino, who told Gaona that "the doctor" wanted Gaona to ask "how many . . .

4

blueprints will he give you." Chino said "the doctor" also directed that only Gaona and Jorge Mercado (also known as "Animal" and "Serio") should handle the "blueprints." Gaona confirmed, "I will take half and he the other half." Gaona left the house after about 15 minutes.

A series of vehicles arrived at the Compton Avenue house, drove to the back of the property, remained there for 10 to 15 minutes, then drove away. A Toyota Tundra arrived and drove to the back of the property. A few seconds later, Mercado arrived in a red or maroon Nissan Sentra and drove to the back of the property. A few seconds later, a Nissan pick-up truck driven by a man later identified as Aguilar arrived and drove to the back of the property. Aguilar loaded bags into the bed of his truck and covered them with "trash" and "other stuff to make it look like just some junk." After about 10 minutes, Mercado's Sentra, Aguilar's pick-up truck, and the Toyota Tundra drove away from the house. The Tundra followed Aguilar's pick-up truck.

Undercover officers followed Aguilar's pick-up truck and the Tundra to a property on West 46th Street. Aguilar drove his truck down a long driveway and out of sight of the surveillance officers. Task force member James Rodriguez, of the Anaheim Police Department, testified that the driveway led to a group of single-car garages and garage apartments situated behind the house that was visible from the street. For the entire 10 minutes that Aguilar's truck was out of the officers' sight, the Tundra slowly circled the block, and its driver looked into cars parked on the street. Rodriguez opined that the driver of the Tundra was engaged in counter-surveillance, looking for law enforcement officers. When Aguilar's pick-up truck left the West 46th Street property, its bed was not as full as when it arrived.

About an hour later, Aguilar returned to the West 46th Street property in his pick-up truck. Officers detained him and he consented to a search. Aguilar had keys to one of the garages at the back of the property and a Nissan car found inside that garage. Inside the car in the garage, officers found a total of 173 kilograms of cocaine.

5

Bur opined that the garage officers searched on West 46th Street was a "stash location," whereas the house on Compton Avenue was used to facilitate the transfer of the cocaine to the stash location. Bur testified that "the doctor" was another target of the investigation who was suspected of being the source of the cocaine. Asked a hypothetical question based upon the prosecution's evidence regarding the events of February 6, Bur opined that the statements and actions attributed to Gaona by the testifying surveillance officers were consistent with those of a courier of narcotics and narcotics proceeds.

**3.     Testimony regarding the February 8 seizure (counts 4 through 6, Gaona)**

On the morning of February 8, Gaona and Mercado were in contact by mobile phone, apparently driving separately toward the same location and attempting to locate one another. Gaona told Mercado to "call the guy, man. Tell him you're already here, where he told you to be." Gaona also told Mercado to "go inside the restaurant." In a later call, Gaona directed Mercado to a AM/PM market for another meeting. Gaona also spoke to a man identified only as "Chon," who said he had spoken to someone who had "just finished talking" to Mercado, and told Gaona that Mercado should follow a black Lincoln that was going to be passing him. Chon asked Gaona to let Chon know "when you guys leave from there."

Undercover officers saw Mercado drive Gaona's gold Sentra with the secret compartment into the parking lot of an AM/PM in Mira Loma, in Riverside County. A black Lincoln entered the same parking lot, and Mercado followed it as it drove out of the parking lot and to a house on Bain Street in Mira Loma. Mercado drove the gold Sentra into the garage of the house and someone closed the garage door. Minutes later, Mercado twice phoned Gaona and asked him how to open the secret storage compartment in Gaona's Sentra. Gaona described for Mercado how to open it, and at one point said, "The same as yours, man." Mercado left in the gold Sentra about 30 minutes later. Gaona phoned Mercado and asked if anyone had given him "blueprints" [narcotics proceeds]. Mercado replied, "No."

6

After Mercado left the house on Bain Street, officers searched it with the consent of the resident, Antonio Acosta. They found eight kilograms of cocaine inside a washing machine, about $5,000 cash, a scale, two handguns, and an assault weapon.

Bur opined that the Bain Street house was a stash house. Asked a hypothetical question based upon the prosecution's evidence regarding the events of February 8, Bur opined that the statements and actions a attributed to Gaona by the testifying surveillance officers were consistent with those of someone who facilitated a delivery of narcotics by the actual narcotics courier.

**4.      Testimony regarding the February 13 seizure (counts 7 through 9, both defendants)**

On the morning of February 13, Gaona and Chon had a phone conversation in which Chon gave Gaona a telephone number for "Mayel." Chon said "It's for both of you, man, for you and Animalito [Mercado]." Chon said he would phone Mercado later because he was "probably still asleep." Gaona phoned the number Chon had provided and told Mayel, "I'm bringing you some windows" [narcotics] and asked to meet near Mayel's "office." Mayel said his "office" was in Montebello. In a later call, Mayel directed Gaona to a Jack-in-the-Box restaurant and said a "chubby guy" would be waiting for Gaona there.

Undercover officers saw Gaona arrive at the Jack-in-the-Box in his gold Sentra. Gaona drove up to a grey Dodge van driven by Carrera. Gaona and Carrera appeared to nod at one another, then drove away in tandem. Detective Rodriguez lost sight of the two vehicles, but about five minutes later he located the grey Dodge van parked nearby on Beech Street. The van was unoccupied. About 15 minutes later, Gaona and Carrera arrived in the gold Sentra. Carrera got into the van and both Gaona and Carrera drove away together in their respective vehicles.

Carrera parked the van in front of a condominium complex at 870 West Mines in Montebello for about two minutes, then drove back to the same Jack-in-the-Box. Carrera drove up to a red or maroon Nissan, whose driver was not identified at trial. Carrera and

the Nissan drove away in tandem and went to the spot on Beech Street where Carrera had parked his van earlier. He parked it there again and got into the Nissan, which drove to 870 West Mines, entered the complex, and stopped outside the garage for unit F. Carrera got out of the car and opened the garage door. The red or maroon Nissan drove inside the garage, and Carrera closed the door from inside.

Ten minutes later, Carrera opened the garage from the inside and the red or maroon Nissan backed out of the garage. Carrera got inside the Nissan, which drove away. About 25 minutes later, Carrera drove back to the garage at 870 West Mines, unit F, and opened the door. Rodriguez detained Carrera, who consented to a search of the condominium and garage. In the garage, officers found 20 packages of cocaine that collectively weighed in excess of 20 kilograms. Carrera's thumbprint was found on the wrapping of one of the packages. Inside the sparsely-furnished condominium officers found about $15,000, a scale, plastic gloves, and packaging materials commonly used to package cocaine.

Bur opined that the West Mines condominium was a stash house. Asked a hypothetical question based upon the prosecution's evidence regarding the events of February 13, Bur opined that the statements and actions attributed to Gaona by the testifying surveillance officers were consistent with those of narcotics courier, and the actions attributed to Carrera by the officers were consistent with those of a stash house manager.

**5.    Testimony regarding the February 20 seizure (counts 10 through 12, Gaona)**

On the morning of February 20, Gaona and Chon had a phone conversation in which Chon gave Gaona a telephone number for Marcel Cardenas, also known as "Chito." Gaona phoned the number, said that he was "bringing . . . some windows" [narcotics] to Chito, and needed directions to Chito's "office" [stash house]. Chito gave Gaona cross street information. Chon later phoned Gaona and asked if he had spoken to Chito. Gaona said he had, and they had "reached an agreement." Chon directed Gaona

8

to call Chon "when you do your installation" [delivery] because "Doc" wanted to know "so he wouldn't be all worried." Gaona promised to call Chon when he was "there."

Gaona drove his gold Sentra to an ARCO station in Chino. Within 15 minutes Chito arrived in a red Toyota. It appeared to one of the surveillance officers that Chito and Gaona briefly spoke to one another. Chito and Gaona then left the ARCO and drove in tandem to a home on West 9th Street in Pomona. Chito parked along the street and opened the garage. Gaona drove his car into the garage and someone closed the garage door. About six minutes later, the garage door reopened, and Gaona drove away.

About an hour later, Chito left the house carrying a plastic bag that appeared to have something in it and drove away. Officers stopped him and found two kilograms of cocaine in the plastic bag. The house on West 9th Street was searched pursuant to a warrant. Officers found eight kilograms of cocaine in a trashcan in a closet, a handgun, two rifles, a scale, a heat sealer, a money counter, and more than $450,000.

Bur opined that the West 9th Street house was a stash house. Asked a hypothetical question based upon the prosecution's evidence regarding the events of February 20, Bur opined that the statements and actions a attributed to Gaona by the testifying surveillance officers were consistent with those of narcotics courier.

**6.     Defense**

Neither defendant presented any evidence.

**7.     Verdict and sentencing**

A jury convicted Gaona of four counts each of conspiracy to transport cocaine (counts 1, 4, 7, and 10), transportation of cocaine (counts 2, 5, 8, and 11), and possession of cocaine for sale (counts 3, 6, 9, and 12). The same jury convicted Carrera of one count each of the same three offenses (counts 7 through 9). The jury further found enhancement allegations true for each count for each defendant, as follows: for counts 1 through 3, the jury found the amount of cocaine involved exceeded 80 kilograms (Health & Saf. Code, § 11370.4, subd. (a)(6)); for counts 4 through 6, the jury found the amount of cocaine involved exceeded 4 kilograms (Health & Saf. Code, § 11370.4, subd. (a)(2));

9

for counts 7 through 9, the jury found the amount of cocaine involved exceeded 20 kilograms (Health & Saf. Code, § 11370.4, subd. (a)(4)); and for counts 10 through 12, the jury found the amount of cocaine involved exceeded 10 kilograms (Health & Saf. Code, § 11370.4, subd. (a)(3)).

The court sentenced Gaona to an aggregate term of 42 years, consisting of 3 years for the conspiracy in count 1; plus 25 years for the weight enhancement in count 1; plus consecutive subordinate terms of 1 year 4 months for each of the conspiracy convictions in counts 4, 7, and 10; plus 1 year 8 months for the weight enhancement in count 4; plus 5 years for the weight enhancement in count 7; plus 3 years 4 months for the weight enhancement in count 10. The court stayed the sentences on all of Gaona's remaining convictions pursuant to Penal Code section 654.

The court sentenced Carrera to an aggregate term of 18 years on count 7, consisting of 3 years for the conspiracy, plus 15 years for the weight enhancement. The court imposed concurrent terms for counts 8 and 9.

## DISCUSSION

### 1. Trial court's denial of a mistrial after jurors expressed security concerns

Gaona contends that the trial court erred by denying defendants' motion for a mistrial after receiving a note from two jurors expressing security concerns and asking if defendants were free or had access to telephones. Carrera joins in this contention, which is equally applicable to him.

### a. The jurors' note

At the beginning of the second day of testimony in defendants' trial, Juror No. 9 submitted a note to the court. The court informed counsel, but deferred discussing the note until later in the day. In the jury's presence, the court acknowledged receiving the note, promised to address it later, and admonished Juror No. 9 not to discuss it with anyone else.

After the noon recess, the trial court read the note on the record outside of the jury's presence: "[N]umber one: [¶] 'Just as a concern, should we/I be worried about

10

our safety; number two, are the defendants free to walk the street/go home before the case is decided; and number three, did the defendants have communications while in their cells.' And then parenthetically indicating 'cell phone, pay phone, et cetera.'"

**b. The court's inquiry of Juror No. 9**

The Court addressed Juror No. 9 outside the presence of the other jurors: "[T]he thing is that from time to time on cases we get similar concerns that are expressed by jurors. And what I have to say to you under the circumstances is that you have to understand that you must decide this case on the appropriate grounds, which would be the evidence and the law. And whereas I would love to say various things to you and make various assurances to you, I'm really not in a position to do that . . . . [¶] I'm not suggesting that there is any issue in that respect whatsoever, by the way, but what I do need to do is make sure that you understand that [the] appropriate basis upon which to decide this case is not on the basis of any prejudgments as to the dangerousness of the defendants or anyone that [they] are associated with. That would be very much unfair." Juror No. 9 stated she understood this. The court added, "And it's pure speculation that you suggest that there is even any cause for concern to begin with." Juror No. 9 replied, "It's speculation, but it's just again something that is human nature to—and especially when you see this stuff on TV. And as a mother of three, you also keep that in mind. And so, it's as the human nature that I'm asking the question, just as a protective."

The court again told Juror No. 9, "The only thing I can say to you is that it's gross speculation for you to suggest that there is any issue of safety to you or anyone else in this courtroom. There's just no basis for that whatsoever. And it's not something that you should consider in deciding any issue in this case." Juror No. 9 replied, "I wouldn't consider it, you know. That would be separate. But, you know, again, excuse me if I think or if I ask that question. Again, it's something that crossed my mind and have a concern about. And I'm not speculating that anything of that nature will go on. I just— again, I'm a mother of three. I have concerns." She continued, "And so, you know, again, it's speculation. I just found myself leaving yesterday and just kind of, you know,

11

looking over my shoulder and that was uncomfortable.  [¶]  . . .  [¶]  So it's just something, again, human nature to feel that way, especially in the society we kind of are surrounded with"

The court assured Juror No. 9 that her "concerns are just not placed in the right direction."  She responded, "It's not necessarily just because of this case.  It could be about any other case.  It's just again a concern that is a question I had to ask."  The court advised her that there had not been a juror safety issue in his 20 years on the bench and again admonished her not to speculate or have fear.  Juror No. 9 replied, "I'm not speculating.  I'm not.  It's just a question.  It's not going to alter my decision.  I understand it's based on the facts and, you know, again concern."  The court also informed Juror No. 9 that "by raising this issue, by implication you're considering something that you shouldn't in this case, that there is no evidence for and so forth and so on."

Counsel for Gaona asked Juror No. 9 whether the topic of juror safety had been discussed among the jurors.  Juror No. 9 replied, "I do have to be honest.  I'm being honest.  It's a concern I think of everyone in the jury room.  They had brought up that and that's originally when we asked the question, it was—I kind of wrote it on behalf of everyone in there with the concern only, again, from what we see on TV and what we hear it was a concern.  [¶]  And there was another juror in there who wrote the other question that most of the people had."  Juror No. 9 clarified that she wrote the first question, then Juror No. 11 wrote the remainder of the note.

After counsel declined to question Juror No . 9 further, the court directed Juror No. 9 to return to the jury room, send Juror No. 11 into the courtroom, and refrain from discussing her conversation with the court with anyone until the case was over.  The court also reminded Juror No. 9 that discussing the matter of juror safety violated the court's order, repeated numerous times, not to have "any discussions of any sort about the case" and not to "express any opinions, any conclusions, draw any conclusions of any

12

sort about the case while the case is being presented to you . . . ." Juror No. 9 agreed to comply with the admonitions.

Outside the presence of any jurors, counsel for both defendants argued that the jurors' safety concerns had compromised defendants' presumption of innocence, and that the jury was violating its duty not to discuss the case. The court remarked that the nature of some cases made it "only natural that a juror should feel some concern. [¶] And unfortunately, drug cases of this type proportion obviously, I think reasonably engender those kinds of concerns, too, because people wonder if perhaps there's some network at play here and there might be some repercussions and so forth. We hear about that sort of thing all the time. [¶] The juror did express that there was some concern or some discussion about that and obviously some concern exists. I have had that happen on other cases. And to the extent that those jurors who express that sort of concern have remained they have done exactly what she seemed to do and that is say that she understands that it is speculation, that it would not be fair to consider it in assessing guilt or innocence, that she would make every effort to comply with the rules."

The court continued, "Obviously, she didn't see this as discussing the case where, in fact, it is. And I was clear to them, although I thought sufficiently anyway, that they could have no discussion of any sort, no matter how innocuous it might seem about the case. [¶] . . . [¶] So this sort of thing does happen from time to time. I don't hear from her that she automatically has convicted them or would find them guilty on the basis of such a concern in the alternative."

### c.     The court's inquiry of Juror No. 11

The court spoke with Juror No. 11 outside of the presence the other jurors. Juror No. 11 told the court, "I was just—we were told if we had a question we could ask. I was just curious and wrote the question down. That's all." Juror No. 11 confirmed that she wrote the portions of the note asking whether appellants were out of jail or had access to telephones. The court asked why such matters were of concern to her. She replied, "Just

13

it was matter of just curious for safety." The court asked whether Juror No. 11 thought her safety was "at risk here." She responded, "No, not at all. I was just curious."

The court told Juror No. 11 it could not "answer those questions because they're not relevant to the issues of the case." The court reminded Juror No. 11 that she was required to decide the case on the basis of the evidence presented in court and the law, "and concerns such as those you expressed just don't have any place in that this [*sic*] province." Juror No. 11 responded, "Absolutely." The court then warned Juror No. 11 that "to have such a discussion is technically in violation of the court's previous order that you have no discussions and draw or form no conclusion about the case." Juror No. 11 informed the court that neither she nor any other jurors had discussed the questions on the note or security concerns. She explained she had merely added her question to a sheet of paper that was slid to her, which she understood had been given to the jury by court staff to write out questions. Juror No. 11 insisted the note was not passed to any other jurors and there was no conversation about it.

The court again admonished Juror No. 11 that it was "taboo" for jurors to discuss safety concerns and that such concerns were based upon sheer speculation. Juror No. 11 responded, "I completely understand."

### d.    Defendants' motion for a mistrial

After Juror No. 11 returned to the jury room, counsel for both defendants moved for a mistrial. The court stated, "I wouldn't be inclined to declare a mistrial. I don't think we've seen anything that even remotely approaches what would necessitate that. However, that isn't to suggest that this isn't of great concern to me." The court remarked it had never known jurors to pass notes to one another, and intended to direct the jurors "that if anyone has any question for the court, just write it down on a piece of paper, fold the paper, and give it to a member of my staff as opposed to passing it around where others can see it, that sort of thing." At the request of the parties, the court agreed to inquire whether any other jurors saw the contents of the note or knew of its subject matter.

14

### e. The court's inquiry of, and admonition to, the entire jury

In the presence of all jurors, the court stated, "Now, let me preface my comments by saying that you are not professional jurors and you don't know all of the ins and outs of the law. . . . [¶] . . . So let me just say, again, as a prefatory comment, that I'm not finding fault with any of you by any stretch of the imagination, so please don't think I'm being critical when I say this, but I need to ask a few questions before I kind of get to the sum and substance of it. [¶] And let me just say preliminarily also that there was a note that the court received, I think I commented on it earlier in your presence, and two of you have written various things on this note. And the understanding is that the note may very well have been passed and displayed during the course of your being in the jury room. [¶] So to the extent that any one of the rest of you might have seen the contents of this note, and I'll hold it up." The court asked if any juror had "read the contents of this other than Juror No. 9 and Juror No. 11, or is familiar with the contents even?" The court stated on the record that no juror responded affirmatively.

The court continued, "When you are back there in the jury room, when you are sitting in front of the court waiting in the hallway, when you are here in the courtroom, when you are at home, you must not, you cannot do anything that might compromise your ability to completely be fair to both sides in this [case], to both defendants as well as to the People. [¶] And remember, that at the outset of this trial I questioned you and instructed you quite a bit on not only being fair but affording the appearance of fairness also, both of which are equally important. [¶] So to the extent that anyone might speculate about the defendants or various aspects of them or anyone else in this case or anything else relating to the case you just can't do it. Does that make sense to everyone? Okay. [¶] And I know that that's a tall order because we're all human beings. Our minds always are working. You're all looking at me and thinking things even if I tell you not to, but at least make every conscious effort to not do that. And you must ultimately decide the case based on the evidence and the law. Does everyone understand? Okay. Is

15

there anyone who feels that she or he cannot be completely fair to both sides in this case?" The record does not reflect that any juror indicated he or she could not be fair.

The court continued, "You heard evidence thus far. You should not form any conclusions or you should not have formed any conclusions thus far because you haven't heard everything. You just haven't heard everything. And when you have heard everything and you've heard the arguments and you've heard the instructions, then you can form conclusions about the case, but only then will you be sufficiently equipped to do so. Okay? So please do keep that in mind, everyone. It's very important. Okay? Okay. [¶] Anyone who feels that he or she cannot do that? Okay. All right." The record does not reflect that any juror indicated he or she could not comply with the court's directives.

### f. Dismissal of Juror No. 2

On the fifth day of trial, Juror No. 2 submitted a note to the court expressing concern about potential release of his name and contact information. After consulting with counsel and inquiring of Juror No. 2 and Juror No. 11, who told the court Juror No. 2 had unsuccessfully attempted to show him a website on his phone, the court dismissed Juror No. 2 over the objection of the defendants. Neither defendant renewed his motion for mistrial as a result of this note and inquiry. Although Gaona's opening brief and the Attorney General's responsive brief describe and refer to this incident, it is irrelevant to the issue actually raised, which pertains only to the denial of the motion for mistrial on the second day of testimony.

### g. Standard of review and applicable legal principles

The trial court should grant a mistrial if it "'is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) "Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis." (*People v. Chatman* (2006) 38 Cal.4th 344, 369–370.)

16

We review the denial of a motion for mistrial for abuse of discretion. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.)

A sitting juror may be removed where there is good cause for the trial court to conclude that he or she is unable to perform his or her duty. (Pen. Code, § 1089.) The decision to retain or discharge a juror is also entrusted to the trial court's discretion. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) "'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 807 (*Jablonski*).)

A juror's expression of security concerns does not necessarily establish that the juror is unable to fulfill his or her functions as a demonstrable reality. (*Jablonski*, *supra*, 37 Cal.4th at p. 807 [no abuse of discretion in failure to discharge sitting juror who expressed concern defendant may have phoned her but was confident she could be fair and impartial]; *People v. Navarette* (2003) 30 Cal.4th 458, 499–500 [no abuse of discretion in failure to discharge sitting juror who expressed concern about personal and family safety where court assured jury that defendant did not have access to questionnaires or identifying information, court asked all jurors to report if they could no longer be fair and unbiased, and concerned juror said nothing more].)

**h.      The trial court did not err by denying defendants' mistrial motions**

Juror No. 9's written note did not state that she feared defendants or their associates. She merely asked whether jurors should be concerned about their safety. Her subsequent explanations and responses to the court established that her inquiry stemmed from "human nature" and "stuff on TV," rather than any evidence, undisclosed personal experience or bias, the defendants themselves, extraneous information, or outside influence. She further explained, "It's not necessarily just because of this case. It could be about any other case." The trial judge assured her that he had never had a juror safety

17

issue in his 20 years on the bench. Juror No. 9 agreed with the court's assertion that she was merely speculating, agreed not to speculate, and further agreed that she would decide the case on the basis of the evidence and law and would not consider any issue of safety. She stated, "It's just a question. It's not going to alter my decision." The trial court, which was able to assess Juror No. 9's demeanor and credibility, concluded that she was not biased toward any party and was able to fulfill her duties as a juror, even though she "didn't see this as discussing the case where, in fact, it is." We conclude that the record does not show a demonstrable reality that Juror No. 9 was biased or otherwise unable to perform her functions as a juror.

Similarly, although a fear of defendants or their associates seemed implicit in Juror No. 11's questions regarding whether defendants were "free" and had "communications in their cells," the juror denied that she thought her safety was at risk and insisted she was "just curious." Juror No. 11 assured the court, to the court's satisfaction, that she understood she was required to decide the case on the basis of the evidence and the law, without considering concerns such as those raised in the note. The trial court was able to assess Juror No. 11's demeanor and credibility, and it concluded she was neither biased nor unable to fulfill her duties as a juror. We conclude that the record does not show a demonstrable reality that Juror No. 11 was biased or otherwise unable to perform her functions as a juror.

With respect to the rest of the panel and alternates, although Juror No. 9 said other jurors had "brought up" the question of security and she "kind of wrote [the note] on behalf of everyone in there," her assertion was contradicted by both Juror No. 11, who denied that there had been any discussions of the matter, and the failure of any juror to respond affirmatively when the court asked if any other juror was familiar with the contents of the note. In the wake of its inquiry, the trial court was apparently satisfied that Juror No. 9's representation that all or numerous jurors expressed security concerns were inaccurate. The court further admonished the jury not to form conclusions until the case was submitted to them, not to speculate, not to do anything to "compromise your

18

ability to completely be fair to both sides," and that it must ultimately "decide the case based on the evidence and the law." The court asked if everyone understood and if there was "anyone who feels that she or he cannot be completely fair to both sides in this case?" The record does not reflect that any juror indicated he or she did not understand, could not comply with the court's directives, or could not be fair to both sides. Accordingly, the record does not establish a demonstrable reality that any juror was biased or otherwise unable to perform his or her functions as a juror.

Because the record does not establish a demonstrable reality that any juror was biased or otherwise unable to perform his or her functions as a juror, there was no ground for discharging any juror, let alone all of the jurors. Accordingly, the trial court did not abuse its discretion by denying defendants' motions for mistrial.

We note that both Gaona and the Attorney General cast the issue regarding Jurors No. 9 and 11 as the receipt of extraneous information. As far as the record reveals, neither juror actually received or communicated any extraneous information. Instead, Jurors No. 9 and 11 posed questions based upon information or ideas they already possessed as a result of news reports, television, or films. The California Supreme Court has recognized that jurors' views are necessarily informed by their life experiences, including their education and employment. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 649.) In addition, news accounts and even fictional stories jurors have previously read, seen, or heard influence their views, especially in relation to activities and subjects with which jurors have no personal experience, such as the manner in which criminal organizations operate. Jurors' views based upon their life experiences and information they have previously received do not constitute receiving extraneous information, although jurors "should not discuss an opinion explicitly based on specialized information obtained from outside sources." (*Ibid.*) Here, the trial court concluded, after its thorough inquiry, that no such discussion occurred. Accordingly, no misconduct regarding the use of extraneous information occurred.

19

**2. Trial court's failure to instruct jury, sua sponte, that it could find one overall conspiracy to commit multiple crimes as an alternative to finding four separate conspiracies**

Gaona contends that the trial court erred by failing to instruct, sua sponte, that the jury could find one overall conspiracy to commit multiple crimes as an alternative to finding four separate conspiracies, using CALJIC No. 17.05 or a similar instruction.[1] This issue is inapplicable to Carrera, who was charged with a single count of conspiracy.

**a. Conspiracy principles**

A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement. (Pen. Code, §§ 182, subd. (a)(1), 184.) "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime.'" (*People v. Swain* (1996) 12 Cal.4th 593, 599–600.) A "conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.)

---

[1] CALJIC No. 17.05 states, in pertinent part, "If you have found the defendant[s] guilty of more than one count of conspiracy, you must then determine whether there was one overall conspiracy to commit [multiple] [two] crimes, or whether there were separate conspiracies. You should consider all of the applicable evidence and determine this issue. [¶] When a single agreement to commit one or more crimes is evidenced by an overt act, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objectives. Whether the object of a single agreement is to commit one or many crimes, it is in either case the agreement which constitutes the crime. One agreement cannot be taken to be several agreements and hence several conspiracies simply because it envisions committing more than one crime. [¶] However, if you find beyond a reasonable doubt that there was not one overall agreement, but separate agreements, each accompanied by an overt act, then separate conspiracies have been established."

20

"[T]he essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 (*Meneses*).) In other words, when multiple crimes are committed, there may be one overall agreement to commit all of them, or multiple separate agreements. "'One agreement gives rise to only a single offense, despite any multiplicity of objects.'" (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557.) "'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result."' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*Meneses*, at p. 1672.) "'The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy.' [Citation.]" (*Lopez,* at p. 1558.) "'Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." [Citation.] The general test also comprehends the existence of subgroups or subagreements.'" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553–554 (*Vargas*).)

**b.     Duty to instruct the jury to determine whether there is one overall conspiracy or multiple separate conspiracies**

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.)

Appellate decisions are divided on whether a trial court has a sua sponte duty to instruct the jury to determine how many conspiracies were committed. (*Meneses*, *supra*, 165 Cal.App.4th at pp. 1668–1669. Most decisions, including the most recent cases,

21

have held that the trial court has a duty to instruct the jury to determine the number of conspiracies committed where there is evidence to support alternative findings. (*Id.* at pp. 1668, 1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*); *Vargas*, *supra*, 91 Cal.App.4th at p. 554.)

The Attorney General relies on two older decisions, *People v. Liu* (1996) 46 Cal.App.4th 1119, and *People v. McLead* (1990) 225 Cal.App.3d 906. These held that the number of conspiracies is not a factual question to be decided by the jury. (*Liu*, at p. 1133; *McLead*, at pp. 920–921.) However, *Liu* and *McLead* are distinguishable. Both involved conspiracies to murder multiple individuals. As the court discussed thoroughly in *Meneses*, *supra*, 165 Cal.App.4th at pp. 1668, 1670–1671, the reasoning in *Liu* and *McLead* with respect to the duty to instruct on the number of conspiracies is questionable, in that both decisions relied upon *People v. Davis* (1989) 211 Cal.App.3d 317, a solicitation to murder case holding that the number of solicitations shown by the evidence was not a question of fact, but was instead equal to the number of potential victims. (*Davis*, at pp. 322–323.) As the court stated in *Meneses*, "*Davis* is thus the ultimate source for this line of authority. *Davis* provides a weak foundation for the proposition that the question of single versus multiple conspiracies is not a question of fact because *Davis* is not a conspiracy case, but a case concerning solicitation of murder." (*Meneses*, *supra*, 165 Cal.App.4th at p. 1670.) "The problem with reflexively extending *Davis* [citation] to all conspiracies is that the number of victims is not a firm basis or indicator for determining the number of conspiracies. It is the agreement, not the overt acts, that defines the crime." (*Ibid*.) We note that even with respect to solicitation of murder cases, there is contrary authority to the effect that the jury must be instructed to determine the number of solicitations. (*People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453–1454.) In reaching its decision, the court in *Morocco* analogized to the "well-settled law that 'the question whether one or multiple conspiracies are present is a question of fact to be resolved by a properly instructed jury' [citation] . . . ." (*Id.* at p. 1453.)

22

We conclude that the better reasoned decisions are those concluding that the number of conspiracies is a question of fact and imposing a duty upon the trial court to instruct the jury, sua sponte, to determine the number of conspiracies "where the evidence supports alternative findings." (*Meneses*, *supra*, 165 Cal.App.4th at p. 1668.)

**c.     The trial court erred by failing to instruct the jury to whether there was one overall conspiracy to commit multiple crimes as an alternative to finding four separate conspiracies**

In *Jasso*, *supra*, 142 Cal.App.4th 1213, a prison inmate was convicted of three counts of conspiracy to import drugs into the prison based numerous phone calls to one contact, who coordinated with the wives of several different inmates who planned to visit their husbands in prison. The contact would obtain the drugs, package them, and give them to the visitor, who would conceal the drugs on her body. On three different days within a two-month period, three separate women visiting their husbands in prison were searched and found to be carrying drugs. (*Id.* at pp. 1216–1219.) The jury was not instructed to determine the number of conspiracies. The appellate court reversed all three conspiracy convictions after concluding that a properly instructed jury could have found a single conspiracy because all three charged "conspiracies occurred during the same narrow time frame and involved the same modus operandi," notwithstanding the existence of multiple attempts on different days to smuggle the drugs into prison using different women as couriers. (*Id.* at pp. 1221–1223.)

Here, the existence, nature, and scope of the conspiracy or conspiracies were established through circumstantial evidence inferred from the conduct and relationship of the various conspirators, together with expert testimony from Bur regarding drug trafficking from Mexico to California by criminal organizations. No evidence unequivocally established that there were four separate agreements, and thus four conspiracies. A properly-instructed jury could have found that the evidence demonstrated the existence of a single conspiracy to sell cocaine from Mexico to wholesale buyers in the greater Los Angeles area, with intermediate essential steps

23

consisting of transporting and storing the cocaine and returning the sale proceeds to Mexico being "tied together as stages in the [execution] of a larger all-inclusive combination, all directed to achieving a single unlawful end or result," that is, selling Mexican cocaine in the Los Angeles area.

Bur's testimony describing the way criminal organizations operated to import, store, and distribute cocaine, then return the proceeds to Mexico described a systematic and ongoing business operation, not a series of impromptu, unrelated, opportunistic transactions. Bur further testified that "the doctor," from whom instructions were relayed to Gaona through Chino on February 6 and Chon on February 20, was another target of the task force investigation and was suspected to be the source of the cocaine in Mexico. Chon provided Gaona with instructions and contact information for the February 8, February 13, and February 20 deliveries, thus supporting an inference that Gaona was operating on behalf of the same principal on each of those days. Mercado was also involved in at least the February 6 and February 8 deliveries and perhaps the February 13 delivery, as well, given the use of a red or maroon Nissan on February 13 and Chon's statement that day to Gaona that "it" was for both Gaona and Mercado. All of the deliveries were of kilos of cocaine and occurred within a two-week time period, all involved the use of code words on mobile phone calls, all involved Gaona making contact with a stash house manager, the latter three involved the unloading of cocaine from secret compartments in Gaona's gold Nissan Sentra while the car was inside a closed garage at a stash house, and on February 6 and February 8 either Gaona or Mercado (driving Gaona's car) were to collect the proceeds ("blueprints") from the sale.

While each delivery was made to a different stash house run by a different person, this was consistent with either a single conspiracy or multiple conspiracies. There was no evidence, for example, that drug trafficking organizations always used a single stash house or stash house manager. Given the vast size of the greater Los Angeles area and the amount of cocaine seized on the four dates in issue, a properly instructed-jury

24

reasonably could have inferred that the use of multiple stash houses scattered throughout the area and managed by different individuals was merely a necessary or desirable operating strategy of a single ongoing conspiracy, rather than an indication of multiple separate conspiracies.

Accordingly, we conclude the evidence supported alternative findings, that is, that the events on the four dates in issue were all part of a single, overall conspiracy to import cocaine into the greater Los Angeles area and sell it to distributors. Accordingly, the trial court erred by failing to instruct the jury to determine whether there was one overall conspiracy or four separate ones.

The Attorney General contends the jury was properly instructed to determine whether there were four conspiracies because "the instructions given required the jury to find separate agreements for each of the conspiracy charges." In support, the Attorney General cites instructions telling the jury that, to find a conspiracy, it had to find an agreement to transport cocaine, that each count charged a distinct crime, and that the jury must consider each count separately and record its verdict for each count on a separate form. Nothing in the instructions upon which the Attorney General relies told the jury that a separate agreement was required to support each separate conspiracy conviction or, alternatively, that a single ongoing, overall agreement would not support conviction on multiple conspiracy counts. Accordingly, the instructions given did not satisfy the court's duty to instruct with CALJIC No. 17.05 or a similar instruction.

d.      **The error was prejudicial**

Instructional error that does not impair a federal constitutional right requires reversal only if it is reasonably probable that a properly instructed jury would have returned a verdict more favorable to the defendant. (*People v. Rogers* (2006) 39 Cal.4th 826, 875; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Because there was no evidence that each of the four events witnessed by law enforcement was the subject of a separate conspiracy and the evidence supported a reasonable conclusion that there was a single ongoing, overall conspiracy, we conclude it

25

is reasonably probable that a properly instructed jury would have found there was a single conspiracy, not four conspiracies.

If one overall conspiracy had been found, Gaona's sentence could have been shorter and the circumstances of his incarceration more favorable.

Accordingly, we reverse Gaona's conspiracy convictions (counts 1, 4, 7, and 10) and remand for a new trial.

**3.     Instruction on preponderance of evidence standard**

Gaona contends that the trial court reduced the prosecution's burden of proof by instructing the jury with CALJIC No. 2.50.2, which defines the preponderance of evidence standard, without telling the jury where or how that standard applied.  Carrera joins in this contention, which is equally applicable to him.

**a.     The reasonable doubt standard**

The Fifth and Sixth Amendments to the United States Constitution require that every criminal conviction rest upon a jury determination that the defendant is guilty beyond a reasonable doubt of every element of the charged crime.  (*United States v. Gaudin* (1995) 515 U.S. 506, 509–510 [115 S.Ct. 2310].)  The jury in a criminal trial must be instructed on this requirement.  (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 [114 S.Ct. 1239].)

**b.     The instructions given**

The trial court instructed upon the reasonable doubt standard using CALJIC No. 2.90.[2]  It further instructed with CALJIC No. 6.22, which provided, in pertinent part,

---

[2] CALJIC 2.90:  "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  [¶] Reasonable doubt is defined as follows:  It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

"Before you may return a guilty verdict as to any defendant of the crime of conspiracy, you must unanimously agree and *find beyond a reasonable doubt*, that (1) there was a conspiracy to commit the crime of transportation of cocaine, and (2) a defendant willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy. You must also unanimously agree and *find beyond a reasonable doubt*, that an overt act was committed by one of the conspirators. You are not required to unanimously agree as to who committed an overt act, or which overt act was committed, so long as each of you *finds beyond a reasonable doubt*, that one of the conspirators committed one of the acts alleged in the information to be overt acts." (Italics added.)

The trial court also instructed the jury with CALJIC No. 6.25, which included the following: "In order to find a defendant guilty of the crime of conspiracy to transport cocaine, you must *find unanimously beyond a reasonable doubt* that the defendant conspired to commit the crime of transportation of cocaine." (Italics added.) With respect to the charges of possession of cocaine for sale, the trial court instructed the jury on the possibility of convicting defendants of simple possession of cocaine as a lesser included offense: "If you are not satisfied *beyond a reasonable doubt* that the defendant is guilty of the crime charged, you may nevertheless convict him of any lesser crime, if you are *convinced beyond a reasonable doubt* that the defendant is guilty of the lesser crime." (CALJIC No. 17.10, italics added.)

In addition, the court's instruction to the jury regarding the weight enhancement allegations included the following statement of the burden of proof: "The People have the burden of proving the truth of each of these allegations. If you have a *reasonable doubt* that it is true, you must find it to be not true." (CALJIC No. 17.21, italics added.)

Among the numerous instructions on the law pertaining to conspiracies, the court instructed the jury on co-conspirators' statements using CALJIC No. 6.24.[3] This

_____

[3] In pertinent part, CALJIC No. 6.24 provided, "Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine by a preponderance of the evidence: [¶]

27

instruction utilizes the preponderance of evidence standard, but does not define it. To define the preponderance of evidence standard, the trial court instructed with CALJIC No. 2.50.2,[4] which the court read to the jury immediately after CALJIC No. 6.24.

The court further instructed the jury with CALJIC No. 1.01, which provided, in pertinent part, "Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others."

### c.     Evaluating the sufficiency of jury instructions

The correctness of jury instructions is determined by reviewing the instructions as a whole, not just an isolated instruction or part thereof. (*People v. Cross* (2008) 45 Cal.4th 58, 67 (*Cross*).) Purportedly erroneous instructions are reviewed in the context of the entire charge to determine whether it is reasonably likely the jury misconstrued or misapplied the challenged instruction. (*Id.* at pp. 67–68; *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) We presume that jurors are intelligent and capable of understanding and correlating all jury instructions given. (*People v. Kegler* (1987) 197 Cal.App.3d 72, 80.)

---

1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed; [¶] 2. That the statement was made while the person making the statement was participating in the conspiracy; [¶] 3. That the statement was made in furtherance of the objective of the conspiracy, and was made before or during the time when the party against whom it was offered was participating in the conspiracy."

[4] CALJIC No. 2.50.2: "'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. [¶] You should consider all of the evidence bearing upon every issue regardless of who produced it."

28

**d.  The preponderance of evidence instruction did not reduce the prosecution's burden of proof**

Defendants do not challenge the propriety of instructing with CALJIC No. 6.24. Given the numerous statements of various co-conspirators in the course of intercepted phone calls, the instruction was appropriate and inured to defendants' benefit.  Because CALJIC No. 6.24 used the phrase "preponderance of the evidence," it was incumbent upon the court to define this standard, for which it used CALJIC No. 2.50.2.  The only two references in the entire set of instructions to the preponderance of evidence standard were in CALJIC No. 2.50.2 and CALJIC No. 6.24.  It was clear from remainder of court's other instructions, such as CALJIC Nos. 6.22, 6.25, 17.10, and 17.21 that proof beyond a reasonable doubt was required to convict either defendant of any charge and to find any of the weight enhancement allegations true.  Nothing in the instructions authorized the jury to use the preponderance of evidence standard except as authorized by CALJIC No. 6.24.  We conclude it was not reasonably likely the jury misconstrued the instructions as authorizing conviction of the charged offenses or true findings on the enhancement allegations based on a preponderance of evidence standard or that the jury otherwise misapplied the preponderance of evidence instruction outside the sole context of determining whether to consider a co-conspirator's statement against a defendant.

**4.  Concurrent sentences for Carrera's convictions violated Penal Code section 654**

The trial court sentenced Carrera on the conspiracy to transport cocaine conviction (count 7) and imposed concurrent terms for his transportation of cocaine (count 8) and possession of cocaine for sale (count 9) convictions.

Carrera contends, and the Attorney General aptly agrees, that Penal Code section 654 required the trial court to stay the terms imposed upon his transportation of cocaine and possession of cocaine for sale convictions, not simply impose concurrent terms. Gaona joins in this contention, but it is inapplicable to him because the trial court stayed the sentences on all of his convictions except the four conspiracy counts.

29

Penal Code section 654, subdivision (a), provides that "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute prohibits punishment for multiple crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Where Penal Code section 654 precludes sentencing on a given count, the sentence may be imposed and stayed, but may not be concurrent. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1312.)

Here, Carrera violated three statutes through a single, indivisible course of conduct undertaken with a single objective: acquiring cocaine to sell. Imposition of concurrent terms for the transporting cocaine and possession of cocaine for sale convictions violated section Penal Code section 654. We modify the judgment by staying the terms for counts 8 and 9 as to Carrera.

## DISPOSITION

Gaona's conspiracy convictions (counts 1, 4, 7, and 10) are reversed and the cause remanded for a new trial on those counts. Carrera's sentence is modified by staying the sentences for counts 8 (transportation of cocaine) and 9 (possession of cocaine for sale). The judgments are otherwise affirmed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.