[No. H028593. Sixth Dist. Sept. 12, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME MEJIA JASSO, Defendant and Appellant.

1214

## COUNSEL

Ruth McVeigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Eric D. Share, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## RUSHING, P. J.—

### STATEMENT OF THE CASE

A jury convicted defendant Jaime Mejia Jasso of three counts of conspiracy to transport a controlled substance into prison and two counts of transporting a controlled substance into prison. (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11352, subd. (b).) Thereafter, the court found that he had one prior strike conviction. (Pen. Code, § 1170.12.)[1] The court imposed the upper term of nine years for one count of transporting and doubled it under the "Three Strikes" law. It then imposed two consecutive four-year terms, one for the second count of transporting and the other for one count of conspiracy. The court stayed the terms for the other counts under section 654, and ordered that defendant serve the 26-year term consecutively to a life term that he was already serving.[2]

On appeal from the judgment, defendant claims that the trial court failed to instruct the jury sua sponte to decide whether there was one overall conspiracy or multiple conspiracies. He alternatively claims that if the court had no sua sponte duty, then defense counsel rendered ineffective assistance in failing to request such an instruction. Defendant further claims the imposition of an upper term on one count of transporting violated his right to a jury trial.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Although the court expressly ordered the sentence to run consecutive to defendant's life term, the clerk's minutes incorrectly state that the sentence is to run concurrently with the life term. However, the court's oral pronouncement is controlling. (*People v. Mesa* (1975) 14 Cal.3d 466, 471–472 [121 Cal.Rptr. 473, 535 P.2d 337]; *People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1415–1416 [12 Cal.Rptr.2d 172].)

Defendant also filed a petition for a writ of habeas corpus. He alleges that being shackled and required to wear a prison jumpsuit at trial violated his constitutional rights. He further alleges that defense counsel rendered ineffective assistance in failing to request a conspiracy instruction, file a motion for acquittal on two counts of conspiracy, and object to the shackles and prison jumpsuit. We ordered that the petition be considered with the appeal.

We reverse the judgment due to instructional error.

By separate order, we issue an order to show cause returnable before the superior court. (§ 1508, subd. (b).)

FACTS

During the summer of 2001, defendant was incarcerated at Soledad State Prison (Soledad), where he was serving a life term. At Soledad, correctional officers monitor telephone calls made from a bank of phones in the exercise yard. The officers are trained to listen for code words used for drug-related activity. Officer Pete Garcia testified that he monitored numerous calls by defendant, his cellmate Danny Ramirez, and other inmates Francisco Villa and Storm Baucom. He explained that from his post in a watchtower overlooking the exercise yard, he could see the bank of 18 numbered telephones and listen to the conversations on them. He stated that when he heard suspicious conversation, he wrote down the date, time, and phone being used on a scrap of paper; and, when he did not know who the inmate caller was, he would call for a yard officer to go get the particular inmate's identification number. Sometime after each call, Officer Garcia passed along the information to Officer Doglietto for further investigation. Later, he compiled informal logs containing all of the information on the scraps of paper for his own personal records.[3] Officer Garcia noted that defendant and

---

[3] Officer Garcia testified that although he was trained to pass along information about suspicious calls for further investigation, he did not receive systematic training on how to do it. He was simply told to do "whatever you needed to do to keep it . . . ." Nor was he instructed to maintain logs of the information or trained in how to collect and memorialize the information. In this regard, Officer Garcia explained that there were no official forms for keeping the information about suspicious calls so he used scraps of paper and later constructed personal logs. Officer Garcia could not recall when he constructed the logs and conceded that it could have been one or two months after the calls were made. He did not give his logs to Officer Doglietto.

Officer Doglietto testified that computers at the facility maintain recordings of telephone calls and also store information such as the date and time of a call and which phone is being used, the number dialed, and the duration of the call. Officer Garcia did not testify that he consulted or used the computer records in constructing his logs, and the computer records were not offered at trial.

Officer Garcia's logs were used and admitted into evidence at trial.

Ramirez made many calls to the same number, which belonged to a person named Ruben Ambriz, who had visited defendant several times between 1997 and 2001.

Officer Abel Ricardo Munoz testified that he was regularly posted in the yard and was often asked to identify inmates who were using the phones. On May 31, 2001, Officer Garcia called and asked him to identify an inmate using a particular phone. Every phone was being used. He waited for the inmate to finish the call and then obtained his identification number. The caller was defendant.

Officer Doglietto, who was assigned to the narcotics and crime scene investigative unit at Soledad, testified generally about how drugs are smuggled into prisons and by whom. He listened to numerous calls that Officer Garcia attributed to defendant, Ramirez, Baucom, and Villa and interpreted their code language.

Officer Doglietto stated that on June 5, 2001, defendant called Ruben and told him to call a woman named "Sara," who lived in Goleta. He gave Ruben two phone numbers. He told Ruben to tell her "that you're going to take something for Storm . . . ." Defendant said, "This is where the kids need to be before 12 o'clock on Saturday." The numbers defendant gave to Ruben belonged to Baucom's wife Sara, who was authorized to visit him.

Officer Doglietto opined that this call reflected defendant's effort to smuggle drugs into the prison. He further opined that the call also showed that defendant was testing Ruben to see how Ruben performed. In particular, Officer Doglietto noted defendant's statement to Ruben, "Okay. This is the first—because the first time is a little hard because we're going here and there, but from now on, you know, everything will be better. . . ." "If this thing goes well, we'll know that we can count on you." Officer Doglietto explained that it means "that they're very—very new to this, and with, brackets, 'They'll get much better.' "

On June 6, 2001, defendant called Ruben again. He told Ruben, "Look, I'm going to give you some more names." He gave Ruben the number of a woman named "Mary" and told him to tell her that he (Ruben) had "a package for Danny." Mary was Ramirez's wife, and she was authorized to visit him and had made calls to Ruben. Defendant also gave Ruben the name of a woman named "Theresa." He told Ruben to tell Theresa that Villa would try to call her the next day. Officers later determined that Villa's wife's real

name was Martha Bello Silva, and that she and "Theresa" were the same person. Officer Doglietto opined that this call also reflected a smuggling effort.

On June 14, 2001, Baucom called Sara. He seemed to be afraid of being attacked by other inmates because he had not paid a debt. He asked Sara about a "nickel," and she said, "It wasn't for a nickel; it was for a quarter." Officer Doglietto opined they were talking about a previous visit, during which Sara had brought him some drugs but not enough to pay his debt. Sara was willing to visit again.

On June 23, 2001, Mary visited Ramirez. Upon her arrival, she was searched, and police found 24.57 grams of black tar heroin in her brassiere.

On June 27, 2001, defendant called Ruben again and told him that Sara was "waiting for the kids." Ruben said he would "drop off the kids, the toys for the kids." Defendant told him to "take them to her wrapped up." Officer Doglietto opined that the conversation was about wrapping drugs in latex or rubber for concealment. He also explained the following exchange between defendant and Ruben. According to Officer Doglietto, defendant said to Ruben, " 'This is something that doesn't stop, right?' And Ruben says, 'No, you know that.' And [defendant] says, 'There you go, buddy. That's what I want, because you know what I told you: I have a lot of guys here and they tell me when, when I tell them calm down,' and he laughs. 'I told them, I think this and I think that, and it's really good that you gave me that news, buddy.' " Officer Doglietto opined that the "news" defendant referred to was that he was "happy that Ruben is in agreement, they're going to keep doing this; it's going to be an ongoing business for them."

On June 29, 2001, Baucom called Sara and told her that several inmates had been "busted" for drugs. Sara told him she would visit him on July 15, 2001.

On June 30, 2001, defendant called Ruben. When Ruben said he had gotten the drugs, defendant told him to "put them in double pants, double wrapped." Officer Doglietto opined that they were talking about wrapping the drugs in latex or rubber so they could be hidden inside the body without breaking down.

On July 1, 2001, defendant called Ruben, who said he had seen Sara. Defendant was pleased that "it's done." On July 2, 2001, Baucom called Sara, who said she was visiting the next weekend. However, on July 7, defendant called Ruben and told him that Sara would need another week.

On July 15, 2001, Sara came to visit Baucom. Upon her arrival, she was taken to the hospital for a body cavity search, and police found bindles of marijuana, black tar heroin, and cocaine.

Shortly after this, defendant was transferred to a segregated unit and lost telephone privileges. Ramirez then began calling Ruben on defendant's behalf. On July 20, 2001, Ramirez called Ruben and said, "[defendant] told me to tell Ruben not to be on the lookout, that little car that he has is running fine." Officer Doglietto opined that the point of the message was to tell Ruben not to worry because he was not under suspicion.

On August 9, 2001, Ramirez called Ruben and told him that "the guys are concerned and waiting for Theresa." Ruben said, "I'll speak with her and [see] if she's coming." On August 14, 2001, Ramirez called Ruben and spoke to an unidentified woman. He told her, "If you get in contact with [Ruben], please tell him to get in touch with me through lady Theresa." The woman replied, "As she said, she already has the children. . . . It's just a matter of bringing them." Officer Doglietto opined that the conversations indicated that Ramirez and defendant were making sure that Ruben was in touch with Theresa about bringing the drugs.

On August 15, 2001, Villa called his wife Martha (also known as Theresa) and asked if she had spoken to Ruben. She said, "I was thinking of calling him today, so they could have it ready." On August 16, 2001, Ramirez called Ruben and again spoke to an unidentified woman. She told him that "[Ruben] had to hurry up today because that lady Theresa said she wanted it for today because she's leaving today." Ramirez replied, "Yes, she's stopping by; she's got to go there for the children, and afterwards she's coming over here." According to Officer Doglietto, the conversation was about ensuring that the drugs were ready for Martha to pick up before coming to Soledad.

On August 17, 2001, Villa called Martha and asked if she had spoken to Ruben. She said, "Yes, but right now I'm having problems for getting good weed." Later that day, Ramirez called Ruben, who said that Martha had just left. Ramirez said that she would visit the next day.

On August 18, 2001, Martha came to visit. Upon her arrival, she was taken to the hospital for a body cavity search, and police found bindles of marijuana and black tar heroin.

Officer Doglietto testified that defendant and Ruben had an "agreement" and an "ongoing business" of smuggling drugs into Soledad, using inmates' wives during authorized visits.[4]

## INSTRUCTION ON A SINGLE CONSPIRACY OR MULTIPLE CONSPIRACIES

As noted, defendant was charged with and later convicted of three counts of conspiracy to import drugs. Defendant contends that the court erred in failing to instruct the jury sua sponte to decide whether there was one all-encompassing conspiracy instead of three separate conspiracies. Defendant further contends that if the court had no sua sponte duty to instruct, then defense counsel rendered ineffective assistance in failing to request that instruction.

■ In *People v. Vargas* (2001) 91 Cal.App.4th 506 [110 Cal.Rptr.2d 210], this court stated, "A trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings." (*Id.* at p. 554; see also *People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453 [237 Cal.Rptr. 113].)[5] Specifically, an instruction is warranted where the evidence could support a finding that there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. (See *People v. Vargas, supra*, 91 Cal.App.4th at p. 553; *People v. Skelton* (1980) 109 Cal.App.3d 691, 717 [167 Cal.Rptr. 636], disapproved on other grounds in *People v. Figueroa* (1986) 41 Cal.3d 714, 731–732 [224 Cal.Rptr. 719, 715 P.2d 680].)

■ In *Braverman v. United States* (1942) 317 U.S. 49, 53 [87 L.Ed. 23, 63 S.Ct. 99] (*Braverman*), the United States Supreme Court explained that "when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines. its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one."

---

[4] The defense rested without presenting any evidence or witnesses.

[5] The People do not argue that the court has no duty to give such an instruction. (But see *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133 [54 Cal.Rptr.2d 578] [no duty to instruct]; *People v. McLead* (1990) 225 Cal.App.3d 906, 921 [276 Cal.Rptr. 187]; *People v. Davis* (1989) 211 Cal.App.3d 317, 322–323 [259 Cal.Rptr. 348].)

In *Braverman*, the defendants were charged with multiple counts of conspiracy based on an agreement that would entail violating statutory restrictions on the manufacture, transportation and distribution of liquor. (*Braverman, supra,* 317 U.S. at p. 51.) The parties agreed that all of the statutory violations were incident to a single agreement. The United States Supreme Court concluded that, under such circumstances, there is only one conspiracy, deeming it improper to find "that even though a single agreement is entered into, the conspirators are guilty of as many offenses as the agreement has criminal objects." (*Id.* at p. 53.)

In *People v. Lopez* (1994) 21 Cal.App.4th 1551 [26 Cal.Rptr.2d 741], a jury convicted the defendant of three counts of conspiracy—conspiracy to unlawfully dispose of hazardous substances, manufacture methamphetamine, and possess methamphetamine for sale. (*Id.* at pp. 1553–1554.) The charges arose from an agreement between the defendant and an undercover officer for the officer to deliver a large quantity of ephedrine in return for a portion of the methamphetamine the defendant planned to manufacture. (*Ibid.*) On appeal the court held that "all three of the charged crimes were for one ultimate purpose, sale of methamphetamine for financial gain. All of the acts in each of the three target crimes were incidental to this objective, and many acts were a direct part of more than one of the crimes. Under these circumstances, but one count of conspiracy can be sustained." (*Id.* at pp. 1558–1559; see also *People v. Patrick* (1981) 126 Cal.App.3d 952 [179 Cal.Rptr. 276] [reversing one of two conspiracy convictions involving the same victim]; *In re Nichols* (1927) 82 Cal.App. 73 [255 P. 244] [two conspiracy counts reveals only one conspiracy].)

Defendant claims the evidence could have supported a finding that he and Ruben had a general, all-inclusive conspiracy aimed at achieving a single, unlawful result: smuggling drugs into Soledad. We agree.

■ All three alleged conspiracies occurred during the same narrow time frame and involved the same modus operandi: defendant would call Ruben and give him the name and number of a person who had visiting privileges; and Ruben would procure the drugs, package them, and give them to the visitor, who would conceal the drugs on her body. (See *People v. McLead, supra,* 225 Cal.App.3d at p. 920 [relevant factors in determining whether crimes indicate one or more conspiracies are whether crimes involved the same motives, were to occur in the same time and place and by the same means].) That evidence and Officer Doglietto's interpretations of defendant and Ruben's conversations and opinion that defendant was testing Ruben for what he hoped would become an ongoing business could support a finding that there was a single, all-inclusive agreement that encompassed the three unsuccessful attempts to import drugs, if not possible future attempts.

However, according to the Attorney General, defendant paints his conspiracy with too broad of a brush. In arguing that the evidence did not support an instruction, the Attorney General asserts that defendant "did not merely agree with a group of people on a comprehensive plan to import drugs. Rather, he conspired with different people on separate plans to import various drugs on different occasions and in different manners. The separate plans used different women to achieve the conspiracies' goals. There is no evidence the women knew each other, coordinated their actions, or had any knowledge of what each was doing. The three conspiracies were not 'tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.' "

The Attorney General sees many trees but not the forest. He focuses solely on the details of each failed attempt and the differences between them. However, he overlooks Officer Doglietto's testimony, which supports a finding that each attempt was part of an effort to execute a more general plan between defendant and Ruben. As the authorities noted above make clear, a conspiracy can have multiple criminal objectives. Consequently, if the jury determined that there was but one general plan or agreement, the fact that defendant attempted to commit three crimes, that is, that he attempted to import drugs on three separate occasions, using three different women, would not automatically or necessarily convert a single agreement into three separate conspiracies.

The Attorney General's reliance on a statement by the trial court at sentencing to support his position is misplaced. At sentencing, defendant argued that there was only one conspiracy, and therefore concurrent, not consecutive, sentences were appropriate. In response, the trial court stated, "Well the question there is whether there were independent objectives with respect to the independent conspiracies that were pled and proven, and the jury found to be true. And obviously there were independent objectives. There were—we have independent objectives where independent quantities of drugs being delivered on different days by different people, two different people. And I don't need to rehash the evidence. The jury found that the defendant was independently guilty as a co-conspirator or as an aider and [abettor], in every one of those separate episodes."

The court's comment is irrelevant in determining whether an instruction should have been given because the court relied on the jury's finding of separate conspiracies to support its analysis. However, the jury's verdict is compromised by the court's failure to give a proper instruction.

■ In sum, we conclude that the court erred in failing to instruct on single versus multiple conspiracies. Moreover, given the strong evidence that the three unsuccessful efforts were merely part of a single agreement between defendant and Ruben to smuggle drugs into Soledad, we further conclude that it is reasonably probable the jury would have convicted defendant of a single conspiracy rather than three separate counts of conspiracy had it been properly instructed. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, defendant's conspiracy convictions cannot stand.[6]

Defendant claims that the evidence established as a matter of law that there was only one conspiracy and urges us to simply strike two of his convictions. However, we decline to do so. Defendant does not contend that there is insufficient evidence to support the jury's verdict. Moreover, this is not a case where, for example, a single act is the basis for two counts of conspiracy. (E.g., *People v. Patrick, supra,* 126 Cal.App.3d 952 [single act of kidnapping cannot support separate conspiracy convictions for kidnapping and false imprisonment].) We simply find that the jury should have been directed to decide the factual issue that would have been posed by the omitted instruction.

### Right to a Jury Trial

Citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], defendant contends that the imposition of an upper term based on facts found by the court rather than facts found by the jury or admitted by him violated his Sixth Amendment right to a jury trial.

Defendant concedes that his claim fails because it was rejected by the California Supreme Court in *People v. Black* (2005) 35 Cal.4th 1238 [29 Cal.Rptr.3d 740, 113 P.3d 534], and we are bound by that decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) He makes his claim simply to preserve the issue.

---

[6] Given our conclusion that the error was prejudicial under California's harmless error standard, we need not address defendant's claim that the error violated his federal constitutional rights to due process and a fair trial, which would trigger the more stringent standard established in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. We also need not address defendant's appellate claim that counsel rendered ineffective assistance in failing to request an appropriate conspiracy instruction.

DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied October 11, 2006.