Filed 8/13/14  P. v. Mason CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064346 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233960) |
| CRISTINA LAUREN MASON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

At a joint trial, a jury convicted defendant and appellant Cristina L. Mason of two counts of attempted furnishing of drugs to a person in custody (counts 2, 14), i.e., her

codefendant and incarcerated husband Michael Mason (we refer to the two married persons by first names for convenience). (Pen. Code, §§ 664/4573.9, subd. (a); all further references are to this code unless noted.) Based on the same sets of facts, the jury also convicted Cristina of two counts of conspiracy to furnish drugs to a person in custody (counts 1, 13). (§ 182, subd. (a)(1).) In addition, Cristina was convicted of three separate conspiracy counts to attempt accomplishing the same offenses on three other occasions (counts 4, 7, 10). Other counts on which verdicts were not reached were dismissed (counts 5, 8, 11). The jury did not find true any of the accompanying gang enhancement allegations. (§ 186.22, subd. (b)(l).)

Codefendant Michael was found guilty by the same jury of two counts of smuggling controlled substances into jail (§ 4573), as well as the same five charged conspiracy counts. (§§ 182, subd. (a)(1); 4573.9; counts 3, 6, & 9 pertained only to Michael.) His separate appeal is pending.

Cristina was sentenced to an aggregate term of nine years four months in prison, with the court selecting the midterm of four years on count 1. As for each of counts 4, 7, 10 and 13, she received consecutive terms of one year four months. The sentences for counts 2 and 14 were stayed under section 654, and probation was denied. In a related case for which she was on felony probation at the time, she was sentenced to a concurrent two-year prison term.

Cristina appeals, contending (1) the trial court erred by instructing on a defense of duress only as to Michael (i.e., that he was required by enemy inmates to supply heroin to protect himself in jail), because substantial evidence supported such a defense for her as

2

well, based on the same evidence, so that a sua sponte instructional duty arguably arose, and (2) the trial court erred or abused its discretion by failing to investigate adequately an allegation of juror misconduct. Cristina further contends that basic rules regarding conspiracy require reversal of those convictions for several reasons, e.g., on counts 7 and 10, because a violation of section 4573.9 requires the participation of two parties to accomplish the target offense and therefore a conspiracy theory and substantive conviction are duplicative.[1] (*People v. Mayers* (1980) 110 Cal.App.3d 809, 815 (*Mayers*).) Alternatively, she argues that for all the conspiracy counts, the jury was not properly instructed, sua sponte, on whether a single or multiple conspiracies were formed, and further, the evidence is insufficient to support any conclusion that more than one such agreement existed. (See, e.g., *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*).)

We find no instructional or legal error, nor any abuse of discretion regarding the investigation into the alleged jury misconduct. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

The nature and scope of the issues presented on appeal allow us to summarize the facts of the target smuggling offenses and conspiracy allegations in a somewhat cursory fashion, in order to provide context for the discussion which follows. Beginning in November 2007, Michael was held in jail pending trial on other charges. Michael had Lincoln Park Blood gang ties and had participated in running the gang's prostitution

---

[1]    In brief, section 4573.9 makes it a felony for an unauthorized person who is not in custody to furnish a controlled substance to a person who is in custody.

3

business. He also ran a music business with Cristina, his girlfriend and wife, and she worked for him as a prostitute. For several years, she was known by authorities to be an associate of the Lincoln Park Blood gang, as shown by her tattoos and her use of language in letters and on the computer, such as her e-mail addresses. Over several years, she communicated with Michael while he was in jail, and she put money into his bank account and into the accounts of 14 inmates at the jail. She also posted bail for gang members when Michael told her to do so.

Michael received packages while confined at the George Bailey detention facility. Counts 1 and 2 arose out of a package delivered in August 2010 to a prisoner lodged in his module, Patrick Gladney, that was addressed in handwriting similar to other packages Michael had received. It was stamped "legal mail," was intercepted and heroin discovered inside. It had a false return address from an attorney, and Cristina's fingerprint was found on the package. Another similar package sent to Gladney earlier had contraband tobacco concealed in it.

Regarding count 4, another inmate in Michael's module, Ronnell Davis, received a package in November 2010 that had bulges on the side and that was found to contain heroin. Detective Williamson of the sheriff's department, a jail official, came to believe that Michael, as a Lincoln Park gang member, was involved in heroin smuggling, so he had him transferred to the Vista detention facility.

In count 7, Michael received a package in a "duck" photo mailer at the Vista facility in December 2010. Based on a tip from Detective Williamson, it was intercepted

4

and found to contain heroin.  Count 10 was based on another intercepted package sent to Michael in December 2010, containing heroin.

Michael was transferred back to the George Bailey detention facility, where counts 13 and 14 arose.  In April 2011, deputies there intercepted two packages containing different books, addressed to Michael.  The first book had a bulge in its spine, which turned out to be heroin.  A postal inspector and a detective testified that postal surveillance video showed Cristina mailing the package.  The second book also had a bulge in its spine, which turned out to be cut-up photos of a naked woman, Cristina.

Cristina was charged separately with using a false identification card to gain access to the jail to see Michael, and a search warrant was executed to search her home in March 2010.  Detectives found 19 unused envelopes with the return address of a local attorney, addressed to inmates, as well as a stamp that said "Legal Mail."  The attorney had not authorized such a use of his address.  Detectives also found a book with an altered spine, containing methamphetamine, as well as other mailing envelopes that looked like the intercepted envelopes.  At her home, Cristina had an escort business card with the name "Donna Cherry," showing her in red lingerie.  The marriage license for Cristina and Michael was found at her house.

Detectives also seized a computer from her house.  A forensic examiner found on it pictures of women, including Cristina, displaying large amounts of money.  The photos showed one tattoo, "Don D." inside Cristina's lip, and one across her abdomen, "OG Don Diego'$."  Photographs were found of men displaying hand signs of gang origin.  The examiner recovered a number of e-mail addresses used on the computer that had gang

5

references ("lovetheblood") and references to names used by Michael (Don Diego), or his music business ("mafiamubaby" or damafiamu) and by Cristina (Donna Cherry or bristina, using the gang custom of substituting the letter B for the letter C). Recovered e-mail receipts from Amazon.com showed there were books sent to Michael at both detention facilities, listing either Cristina or "Meshell Gosse" as the shipper.

Jail authorities reviewed numerous monitored telephone calls by Michael to Cristina and others, occurring around the same time as packages were intercepted. In the calls, Michael and other unidentified male callers appeared to be discussing with Cristina and each other, in three-way calls, arrangements for moving contraband around among various persons. They used apparent code words, such as album covers or the names Judy, Ray, or Rudy Huxtable. They also discussed getting money orders from a wiring service, buying or selling a camera or car, and getting flyers or CDs distributed for their music business. Some of the other voices speaking on some of the calls between Cristina and Michael had Mexican accents. There were comments in some of the phone calls possibly referring to an inside jail employee who might be involved ("24 hour postal place").

At times during the calls with Michael or others, Cristina expressed her nervousness or frustration, such as when she was driving on a particular route or when she had not received mail from Michael. At other times, she said she was happy when she learned pictures of her had been delivered to Michael.

Another search warrant executed at Cristina's house found a money order that was made out to a Hispanic individual, the brother of a known high-ranking inmate in the

6

Mexican Mafia at the George Bailey detention facility.  Detective Williamson, as gang expert for the prosecution, explained that such persons are shot-callers who collect taxes from other inmates to allow them to operate illicit businesses behind bars.

Cristina, who did not testify, presented as a defense witness a business associate and former gang member named Thomas Wilson (also known as Li'l T-Dubb), who explained that the term "blood" means friend, rather than being a gang reference.  In Swahili, the word blood is "damu," as reflected in their music business.

In Michael's defense case, other witnesses described several alternative explanations for apparent gang-related expressions they and their associates used in telephone calls and in their music business.

According to Michael's gang expert, private investigator Graham McGruer, the Mexican Mafia (or EME) is a prison gang operating to control prisoners in correctional facilities.  They exact a tax from nonmembers who are planning on conducting criminal activity in the facility, and enforce it with death or injury.  The Mexican Mafia also forces people to bring drugs into prison.

In his own testimony, Michael described how he was falsely accused by the Mexican Mafia of killing one of their family members, and was required to pay them protection on a monthly basis, using Cristina as a go between.  When he called her his "bottom bitch," that meant she is his main girl, not a high-ranking prostitute.  The Mexican Mafia directed him to import drugs into the jail, and its members delivered the drugs to Cristina and instructed her how to send them on to Michael, so he could turn them over to the Mafia members.  If the drugs were intercepted, Michael had to pay the

7

Mexican Mafia more money, and he said they often threatened him and made threats to his wife. To protect her, he told her she was sending him chewing tobacco.

The court and counsel held numerous discussions about evidentiary disputes, such as the admissibility of gang evidence about the Mexican Mafia. Motions in limine were resolved and conferences about jury instructions held, to be described in the discussion portion of this opinion. The court pre-instructed the jury according to the terms of section 1122, about their duty to decide the case based only on the evidence presented.

Following closing arguments and additional instructions, the jury convicted Cristina of two counts of attempting to supply drugs to a person in custody, and five counts of conspiracy to do the same. She was sentenced, as above, and brought this appeal.

## DISCUSSION

### I

*SUA SPONTE INSTRUCTIONS: DEFENSE OF DURESS*

At trial, codefendant Michael showed he was entitled to have the jury instructed on his own duress defense, based on his claim he had participated in smuggling drugs only in response to threats to his life, and "perhaps" to his wife, made by Mexican Mafia members. On appeal, Cristina contends the trial court failed to recognize that she, too, had presented substantial evidence in support of a defense of duress, because when she attempted to send packages of tobacco or drugs to the jail, she did so to protect her husband Michael and herself as well. She claims the court erred when it declined to

8

instruct the jury that she could rely on such a defense, and should have done so sua sponte.

## A. Applicable Standards

In criminal cases, " ' "even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

In this context, substantial evidence means evidence from which a reasonable jury could conclude the defendant committed an offense while under duress. To support an instruction on a duress defense, there must be substantial evidence of " 'the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 290; CALCRIM No. 3402.) A defense of duress may be based on substantial evidence of threats toward the defendant himself or herself, or to a family member or third party. (*People v. Pena* (1983) 149 Cal.App.3d Supp. 14, 22-23.) Thus, a defendant who commits an unlawful act in an effort to prevent imminent harm to a third party can raise a duress defense. (*Id*. at p. 23; see *People v. Heath* (1989) 207 Cal.App.3d 892, 898, 901-902 [where a person holds a gun to the defendant's head and threatens to kill him if he does not commit burglary, evidence of duress has been shown].)

9

In deciding which issues were adequately raised by substantial evidence at trial to create an entitlement to sua sponte instruction on them, the courts will not evaluate the credibility of witnesses, as that is the jury's prerogative. (*Breverman, supra,* 19 Cal.4th at p. 162.) On review in this context, we construe the evidence in the light most favorable to the appellant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

B. Record on In Limine Motions and Instructional Matters

During the hearings on motions in limine, the court discussed the intention of both Michael and Cristina to raise a defense of duress. The court inquired whether Cristina's attorney anticipated that she would be admitting the charged acts and would be asserting she did them with "a lawful justification or excuse because of the duress, the coercion."

Later, the court discussed Michael's attorney's request to present testimony from his expert on the Mexican Mafia, regarding the pressure exerted by its members on Michael to pay protection and to smuggle drugs. Before the defense case began, the court explained that "up to this point I don't think there is any substantial evidence that would raise that defense." In other words, there was no current evidence of a threat of immediate harm of death or great bodily injury, giving rise to "not only [a] good faith belief but an objective and reasonable belief" of imminent harm. (CALCRIM No. 3402.) Michael's attorney called his Mexican Mafia expert to testify on how it placed people under such duress.

In discussing the prosecution evidence, the court acknowledged that Detective Williamson had testified about how the Mexican Mafia may charge "taxes" in jail for conducting business there, but concluded that as to this case, "no connection had been

10

shown to establish duress or menace."  The court referred to the evidence of the Cristina-Michael jail phone calls played for the jury, as failing to raise ongoing evidence of duress exerted over a period of many months.  Also, the video evidence showing Cristina alone, mailing a package in the post office, did not serve to demonstrate she was under immediate pressure or danger or acting out of necessity.

After further discussion about the duress and threats that Michael had described, to himself and his family, Cristina's attorney argued that the same evidence supported an instruction that she had been acting under duress as well.  The court inquired how that squared with the testimony by Michael that Cristina was not told the packaged substances were drugs, and that he told her instead that it was tobacco she was shipping.  The court said that if Michael's and Cristina's theories were that he kept the information about drugs from her, she could not be logically heard to argue she had acted due to immediate threats of death or serious bodily injury.

Detective Resch and others had testified that witnesses were afraid to speak out against the Mexican Mafia, because doing so put them at risk of harm.  However, to the extent Cristina wanted to argue that she could not testify because of her fear of the Mexican Mafia, the court was concerned that the argument would violate the terms of CALCRIM No. 355, telling the jurors they could not speculate about why she chose not to testify.  Regarding the recorded jail phone calls, in which Cristina seemed upset or said she was nervous, the court found that evidence did not yet support an inference of duress, that she was under immediate fear during the phone calls or knew about threats to Michael at the time.

11

## C.  Record Testimony

Michael testified that since 2009, he was required by Mexican Mafia inmates to supply heroin and money to protect himself, because of their constant threats to him and "perhaps" to his wife.  The Mafia knew he was a successful musician who made money in that business, and they required him to use Cristina as a go-between to supply money to them.  When the smuggled Mexican Mafia drugs were intercepted, Michael had to pay them more protection money.  Because of his own wealth, Michael said he did not need to sell drugs in jail for his own profit.

Michael described how the Mexican Mafia members obtained the drugs, brought them to Cristina, and showed her how to package the substance.  He talked to Cristina and others on the telephone about "Judy" and "Ray," as terms for meeting up with the Mexican Mafia to prepare shipments of packages including drugs.  However, Michael claimed Cristina did not know she was smuggling drugs, but instead thought she was sending chewing tobacco dropped off for her by the Mexicans, "[b]ecause I didn't want her to know what was happening."  Michael stated he could not testify about the identity of those Mafia members because that would place him in danger.

Cristina did not testify on her own behalf, and her only defense witness did not provide evidence that he saw her being threatened or forced into packaging and shipping the drugs to the jail.  Thus, Cristina was not allowed to claim she acted under duress, because only speculation had been presented on the issue.  Her attorney nevertheless stated at closing argument that she had complied with Michael's instructions to protect

12

her husband, herself and her family, and she did what she was told to do because her life and his life were being threatened.

## D. Contentions and Analysis

Our inquiry is whether Cristina provided such evidence about the duress exerted upon her by third parties, the Mexican Mafia, that would enable a reasonable jury to make a finding that she attempted to provide drugs to a person in custody only because she was forced, under threat, to do so. She argues that even though no direct evidence was presented that Michael had communicated the threats to her, it can nevertheless be inferred from other evidence about his need for protection against threats, that she was motivated to comply with the Mexican Mafia shipping scheme, in meetings and telephone calls, because she believed that either her own life or Michael's life were in imminent and immediate danger.

We first take note that Cristina relies entirely on Michael's testimony to give rise to the claimed sua sponte instructional duty about her potential defense of duress. He was in jail for several years while she was outside, communicating with him. She does not explain whether any limitations were placed on the use of his testimony about her, or whether the court gave the jury specific instructions about the limited purposes for which his testimony about her role could be considered. Although there was general defense expert testimony that the Mexican Mafia forced people to bring drugs to prison, that witness could not provide specific information about Cristina or Michael.

As a witness, Michael testified about his own percipient knowledge of the activities going on inside the jail over the years he was in custody, and about his communications with people outside. He did not report that bad things happened to him

13

when some of the drug shipments were intercepted, even though he was afraid of future harm to him if that happened. When he testified that the Mexican Mafia threatened Cristina, he did not explain who told him that or how the threats to himself extended to her. Even assuming she knew of some threats, she continued to participate with Mafia representatives in the ongoing processing of packages to smuggle the substances she was given, and went alone to the post office, all without reporting any threats to authorities.

The jury and judge heard recordings of jail calls between Cristina and Michael, and had the opportunity to evaluate her voice and her level of participation with Michael's plans. The court reasonably concluded that this and other evidence in the record did not support her claim that her cooperation with the supplying and shipping activities, over a period of many months, was based on an actual belief that her life or Michael's life were in immediate danger throughout. It was not error for the court to decline to give an instruction on the requested duress defense as to Cristina, nor did any substantial evidence require the court to do so on a sua sponte basis.

Because we have found no error occurred in the instructions given, we need not reach Cristina's arguments about the application of harmless error theory or federal constitutional standards for evaluating such error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

II

*INVESTIGATION INTO POTENTIAL JUROR MISCONDUCT*

Cristina contends the trial court failed to carry out an adequate investigation of potential juror misconduct that occurred during the cross-examination of a prosecution

14

witness, Detective Cahill, when an incident occurred in which he smiled and winked at several jury members, and some laughter followed. Shortly thereafter, while out of the presence of the jury, counsel for Michael told the court, "Apparently while we came out for sidebar last time, Mr. Cahill winked at Juror Nos. 1, 2, and 13 and they started laughing together. That just needs to go on the record. I didn't see it but according to both defendants--I haven't talked to court staff yet but apparently he's making inappropriate faces to the jury while we're out of their presence."

The court responded, "He certainly shouldn't do that." The prosecutor spoke up, "I question the source of that information, your Honor." The court replied, "Yeah. All right. Well, he certainly should be cautioned not to do that."

Cristina's attorney expressed concerns about such possible communication between Detective Cahill and the jury, and requested that the court admonish the witness or the jury. After further inquiry by Michael's attorney on what had actually happened, the court asked what form any such admonishment should take. Cristina's attorney requested "that there should be no communication between this witness and the jury outside the presence of the Court and counsel. If it occurred." Detective Cahill spoke up, "It never occurred." The court replied to counsel, "I think he understands as a professional law enforcement officer that this is totally impermissible. So consider him admonished."

Michael's attorney requested that the judge poll the three involved jurors, on the basis that in the courtroom, Michael and Cristina each saw Cahill laughing with several jurors and winking at one, at a time when counsel was going out for a conference in the back hall. After further proceedings, both defense attorneys moved for a mistrial on that

15

ground.  The court denied the motions, stating, "I don't think there's any credible evidence to, ah, support that motion so that motion is denied."

## A.  Applicable Standards

" ' "When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter."  [Citation.]  Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" [citation], they have considerable discretion in determining how to conduct the investigation.'  [Citation.]  ' . . . The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284 (*Virgil*)*; People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*).)  The courts will not reach issues of prejudice unless jury misconduct is found.  (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

On appeal, we examine the trial court's rulings on the issue for any abuse of discretion.  (*Virgil, supra,* 51 Cal.4th 1210, 1284.)  In this context, the courts assess likely prejudice under this standard by determining whether, objectively viewed, the matter was "inherently likely to have influenced the juror."  (*People v. Marshall* (1990) 50 Cal.3d 907, 951.)  We ask whether the record shows a substantial likelihood that at least one juror was influenced by exposure to extrinsic matter that directly related to the issues at trial.  (*Ibid*.)  "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case."  (*Ray, supra*, 13 Cal.4th at p. 343.)

16

If a jury is inadvertently given and considers extraneous evidence, the incident is not considered to be jury misconduct. (See, e.g., *People v. Cooper* (1991) 53 Cal.3d 771, 836 [a transcript not in evidence was mistakenly sent to the jury room].) In such a case no presumption of prejudice arises. "Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*Ibid.*)

In *People v. Ryner* (1985) 164 Cal.App.3d 1075 (*Ryner*), the appellate court found the trial court erred in concluding no misconduct had occurred, when a testifying officer had engaged in conversation with several jurors during a break outside the courtroom. (*Id.* at p. 1080.) Even though no discussion of the merits of the case took place, the conversation was deemed to be impermissible, because it might well have caused the jury to accord the officer's testimony more credibility than otherwise appropriate. (*Id.* at p. 1082.) "By engaging Officer Boyd in an amiable discussion of police work and other topics of mutual interest, we conclude that the jury members did a disservice to appellant's right to a fair and impartial tribunal." (*Ibid.*) However, neither the misconduct nor the trial court's mistake required reversal, because the incident was relatively trivial and the officer was not a key witness. (*Id.* at p. 1083.)

Although Cristina seeks to have us apply a de novo standard of review for mixed questions of law and fact, regarding the adequacy of this investigation, it would not be appropriate to do so. (See *People v. Cromer* (2001) 24 Cal.4th 889, 900 [the first inquiry is a matter of determining the historical facts, and deferring to the trial court's factual findings; the second "requires application of an objective, constitutionally based legal test to the

17

historical facts"].)  She has not given any reasoned argument for why the usual abuse of discretion test should not apply here.  (*Virgil, supra,* 51 Cal.4th 1210, 1284.)

## B.  Jury Instructions; Investigation

The court explained to the jury panel during voir dire that the only evidence to be considered would be "the testimony of witnesses under oath and some exhibits which may be received."  When testimony began and when the case was submitted to them, the jurors received more instructions about their duty to decide the case based on the evidence presented, and not on matters of "empathy, sympathy, bias, prejudice, public opinion, public feeling." (CALCRIM Nos. 200, 222, 223, 302.)

Numerous sidebar conferences were called throughout trial to discuss objections.  After the initial discussion about Detective Cahill's behavior in front of the jury, the prosecutor updated the court as follows:  "Your Honor, if I may.  I've got a lot going on.  I neglected to inform the Court, um, that during this whole alleged incident, um, defendant [Michael] was mouthing to Cahill something to the effect, 'Motherfucker, got you.'  Like got you in a lie or something like that.  Ah, Investigator Cahill looked away and looked at this, ah, investigating officer, Williamson.  Um, and they were, ah--had some communication with each other.  This was all witnessed by Deputy District Attorney Lisa Moffatt, who was present in the courtroom.  Ah, that was--I was informed of that over the lunch hour by Miss Moffatt."  At that point, the court did not deem it necessary to investigate further.

When Michael's attorney renewed the mistrial motion, the court ruled that "it's been decided," and "[t]here's no credible evidence that that occurred."  Also, the court

denied a second request to poll the jurors on the issue. Later, Michael testified about how he hated the police and he was offended when one of them laughed and winked at some jurors during his trial.

## C. Contentions and Analysis

Cristina contends the trial court did not conduct an adequate investigation into the possible effects upon the jurors of Detective Cahill's conduct, and that her motion for mistrial should have been granted. Initially, the court heard argument from both defense counsel about their clients' observations about the interaction, while Detective Cahill was present, and then it effectively admonished him by reminding him of proper courtroom conduct.

The court also heard another explanation for what happened, when the prosecutor reported that his colleague had seen Michael initiating communication with Detective Cahill, possibly causing a visible response or reaction.

After hearing from all parties about the interchanges during Detective Cahill's testimony, the court determined there was no "credible evidence" that misconduct occurred, and denied the motion for a mistrial. The court reconsidered the matter at Michael's attorney's request, and found that under all the circumstances, it was unnecessary to poll the jury.

"Not every incident of potential misconduct requires further investigation." (*Virgil, supra,* 51 Ca1.4th at p. 1284.) These interactions were fleeting and the concerns raised by defense counsel were speculative in nature. On this record, the court could have reasonably concluded that an informal method of resolving the matter was

19

appropriate, by asking for explanations, informally admonishing the witness, and making a discretionary decision to move on with the case, as it did. (*Ibid.*; *People v. Hayes* (1999) 21 Cal.4th 1211, 1255.)

The court would also have been justified in concluding that even if the detective's reported conduct did occur, such relatively innocuous activity would most probably not have adversely affected the jurors' impartiality in performing their duties, in light of the instructions given to them. (See *People v. Avila* (2006) 38 Cal.4th. 491, 604; *Ryner, supra,* 164 Cal.App.3d 1075, 1083.) The jurors received instructions not to discuss the case and not to consider matters outside of the evidence. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are presumed to follow the court's instructions].)

Moreover, the record shows that numerous sidebar conferences had been going on from the outset of the case, and the court had repeatedly urged counsel to respect the jury's time and move on with the arguments. We need not resolve the conflicting theories in the briefs about why this detective apparently winked at jury members or why laughter ensued, whether because of lengthy delays during trial or friction with a defendant about testimony being given. The trial court's resolution of the investigation matter was not an abuse of discretion, particularly in light of the extensive evidence on the merits of the charges as presented by other witnesses, not Cahill, about Cristina's financial activities and meetings with people at Michael's direction while he remained in jail. (*People v. Seaton* (2001) 26 Cal.4th 598, 676.) Under all the circumstances, the court could reasonably conclude that the procedural problem presented did not warrant further

20

investigation or delay. (*Virgil, supra,* 51 Cal.4th at p. 1284; *Ray*, *supra*, 13 Cal.4th at p. 343.) It was not error to deny the defense motion for mistrial.

III

*CONSPIRACY ISSUES:  TARGET OFFENSE ARGUMENT (COUNTS 7 & 10)*

In both of Cristina's conspiracy convictions on counts 7 and 10 (the intercepted shipments to Vista), there was no conviction on the associated substantive claim (§ 4573.9 [attempting to provide drugs to a person in custody]). Also, the evidence on those particular counts did not include any evidence that any third parties were directly involved (such as a phony addressee or a false return address/sender, or an unidentified telephone caller giving directions to Cristina). In the other counts (1, 4 or 13, arising at George Bailey), false addressees and third party callers were involved.

Cristina thus argues her conspiracy convictions on counts 7 and 10 are reversible. She relies on *Mayers*, *supra*, 110 Cal.App.3d 809, 815, to argue that the evidence about these two target offenses only involved two people, and therefore a conspiracy theory on them is not supported. She cites to section 4573.9, identifying herself as the charged "person, *other than a person held in custody*, who sells, furnishes, administers, or gives away, or offers to sell, furnish, administer, or give away to any person held in custody . . . any controlled substance . . . ," and then claims Michael cannot qualify as such a conspirator, since he was "held in custody."

More generally, Cristina claims that Wharton's Rule applies to crimes that an individual could not commit acting alone, such as bigamy or duelling, and it should forbid

21

these conspiracy theories. (*People v. Johnson* (2013) 57 Cal.4th 250, 265 (*Johnson*); *Iannelli v. United States* (1975) 420 U.S. 770, 782, 786.)

In *People v. Lee* (2006) 136 Cal.App.4th 522 (*Lee*), the court defined and applied Wharton's Rule, as providing "that where 'the cooperation of two or more persons is necessary to the commission of the substantive crime, and there is no ingredient of an alleged conspiracy that is not present in the substantive crime, then the persons necessarily involved cannot be charged with conspiracy to commit the substantive offense and also with the substantive crime itself. [Citations.] . . . The rule is considered in modern legal thinking as an aid in construction of statutes, a presumption that the Legislature intended the general conspiracy section be merged with the more specific substantive offense.' " (*Id.* at p. 530.)

## A.  Applicable Standards

Basic definitions of the offense of conspiracy, under section 182, subdivision (a) require " 'proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, *as well as the specific intent to commit the elements of that offense*, together with proof of the commission of an overt act . . . .' [Citations.] Conspirators must agree to the commission of a criminal act. They also have to possess certain kinds of knowledge and criminal intent. In other words, they agree to the act while possessing a given mens rea. It would be imprecise to say that they 'agree' to have a certain knowledge or mental state. Instead, to satisfy the elements of traditional conspiracy, they agree to an act, and they do so while possessing the required mental state." (*Johnson, supra*, 57 Cal.4th at pp. 263-264; original italics.)

22

In *Lee, supra*, 136 Cal.App.4th 522, the defendant was being prosecuted for conspiracy to send drugs to a person in custody, but was not himself in custody. The court discussed whether any exceptions should apply in such a case to the general rule, that " 'a defendant may be liable to prosecution for conspiracy to commit a given crime even though he is incapable of committing the crime itself.' " (*Id*. at p. 529.) Such an exception to the general rule, Wharton's Rule, "applies only where it is impossible to have the substantive offense 'without concerted effort amounting to conspiracy . . . .' " (*Id.* at p. 530l, italics omitted, citing *Mayers, supra,* 110 Cal.App.3d at p. 816; *Iannelli v. United States*, *supra*, 420 U.S. at pp. 783-784.)

" 'The classic Wharton's Rule offenses--adultery, incest, bigamy, duelling--are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large. [Citation.] Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert. It cannot, for example, readily be assumed that an agreement to commit an offense of this nature will produce agreements to engage in a more general pattern of criminal conduct.' " (*Lee, supra*, 136 Cal.App.4th at p. 530.)

In *Lee*, the court concluded, "Section 4573.9 is not the type of crime usually seen as a classic Wharton's Rule offense. [Citation.] More importantly, it is possible to have the substantive offense 'without concerted effort amounting to conspiracy. . . .' [Citation.]

23

For instance, one may administer a controlled substance without the consent, or against the will, of the person to whom it is administered, and one may offer to sell or give away a controlled substance to one who does not accept the offer. Thus, while two people may act in concert to violate the statute, such cooperation is not necessary. [Citations.] Moreover, while the person who buys or obtains a drug is not generally an accomplice of the person who sells or furnishes it [citation], an exception exists where, as here, the participants 'conspire together in a prearranged plan . . . .' " (*Lee, supra*, 136 Cal.App.4th 522, 530-531.)

### B. Testimony and Analysis

According to Cristina, there was no need or justification for punishment for these two conspiracy counts, when the conspiratorial group consisted of the very same two people who committed the target crime. She claims the direct and circumstantial evidence on counts 7 and 10 was limited to herself and Michael, including the overt acts, so that only one related conviction for each is proper. For example, in December 2010, Michael had only recently arrived at the Vista facility, and he did not know anyone there that he could use as a false addressee.

The first flaw in this theory about counts 7 and 10 (two intercepted shipments to Vista) is that logically section 4573.9 can be violated without concerted effort, such as when a shipment of drugs is offered, but is not accepted. (*Lee, supra*, 136 Cal.App.4th at p. 531.) This section and related statutory law show that the Legislature intended to take action to prevent drugs from flowing into the prison system, and to forbid noninmates from joining in

24

agreements with inmates to introduce controlled substances into custodial facilities. (*Id.* at p. 538.)

Moreover, the evidence was adequate to show not only that Cristina and Michael reached mutual understandings to accomplish these separate acts, but they had an unlawful design with a network of participants to accomplish the target offenses. (*Johnson, supra*, 57 Cal.4th 250, 263-264, 266.) There was evidence of conspiracy and of individualized overt acts committed with and by unidentified third parties, such as Mexican Mafia representatives, who provided the drugs, took money from Cristina for them, and showed her how to package them. Michael and Cristina anticipated in each instance that the drugs being provided would be passed on to other participants to sell in jail, as sellers or purchasers. The legislative intent of section 4573.9 is well served by allowing these two factually supported conspiracy convictions to stand.

IV

*SUPPLEMENTAL BRIEF ARGUMENTS ON CONSPIRACY (ALL 5 COUNTS)*

Cristina next argues the evidence would have supported alternate findings on whether a single conspiracy or multiple conspiracies existed for making these shipments of drugs, because there was no direct evidence of any agreement or agreements between herself, Michael, or any third party to smuggle drugs. She claims that jury instructions were required to be given by the trial court, sua sponte, on whether a single or multiple (five) conspiracies were formed. (*Jasso*, *supra*, 142 Cal.App.4th 1213, 1220-1221; *People v. Vargas* (2001) 91 Cal.App.4th 506, 554.)

25

Alternatively, Cristina contends the evidence only supported a conclusion that she and Michael had a single agreement to make continuing shipments of drugs into jail, and as a matter of law, four of the conspiracy convictions must be reversed for insufficient evidence. (See, e.g., *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669-1671 (*Meneses*).) We address these claims in turn.

### A. Sua Sponte Instructions; Analysis

On the adequacy of the conspiracy instructions, Cristina again seeks to have us apply a de novo standard of review for mixed questions of law and fact, as described in *People v. Cromer, supra*, 24 Cal.4th 889, 900 [deferring to the trial court's factual findings on the historical facts, then applying "an objective, constitutionally based legal test to the historical facts"].) That is not the appropriate test. Rather, we are required to decide if substantial evidence was presented to require the trial court to instruct on general principles of law relevant to those issues, here, the existence of one or instead, multiple conspiracies. (See *Breverman, supra,* 19 Cal.4th 142, 154*, 162.)

"It is well-settled that the essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies. As the United States Supreme Court stated long ago: 'The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts. . . .' [Citation.] ' "The conspiracy is the crime and that is one, however diverse its objects." ' " (*Meneses, supra*, 165 Cal.App.4th 1648, 1669-1670.)

26

" 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result." ' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*Meneses, supra*, 165 Cal.App.4th 1648, 1672, citing *People v. McLead* (1990) 225 Cal.App.3d 906, 920.)

As explained in *Meneses, supra*, 165 Cal.App.4th 1648, 1668, there is a split of authority among California intermediate appellate courts on whether a sua sponte duty applies, for instruction of a jury on the existence of single or multiple conspiracies, where the evidence would support alternative findings on the number involved. (*Jasso, supra*, 142 Cal.App.4th at p. 1220.) There is also disagreement about whether it should be a question of fact for the jury to decide if the evidence shows a single conspiracy or multiple conspiracies. (*Meneses, supra*, at p. 1668; *People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453; but see *People v. Davis* (1989) 211 Cal.App.3d 317, 322-323; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133.)

As we will explain, it is not necessary for us to enter into that debate on the necessity of sua sponte instructions about the number of conspiracies demonstrated, either in the abstract or on this record. We also need not reach the argument by the Attorney General that Cristina has forfeited this agreement, by failing at trial to request an instruction on the number of conspiracies proven. In any event, this record will not support potential

27

alternative findings on the question of single versus multiple conspiracies, for the following reasons.

First, the conspiracy crime has the purpose of punishing an agreement to act unlawfully. " 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act, "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*Johnson, supra*, 57 Cal.4th 240, 257, quoting *People v. Morante* (1999) 20 Cal.4th 403, 416.) A criminal conspiracy may be shown by direct or circumstantial evidence that the parties came to a mutual understanding to accomplish an act with an unlawful design. (*Johnson, supra,* at p. 264.)

The circumstantial evidence presented showed that there were several agreements formed here between Cristina and Michael that were "distinct and disconnected, not part of a larger all-inclusive combination directed to a single unlawful end." (*Meneses, supra*, 165 Cal.App.4th at p. 1672.) They used different combinations of conspirators, addressees, messengers, packaging materials, methods of concealment, and shipments from different locations, over different time periods. Although there was consistency among the coded language used in the phone calls for arranging transactions ("Judy" and "Ray"), there were different participants who gave Cristina instructions, with different results. At times she expressed confusion or asked for clarification, and then followed through.

This was not a case in which one overall agreement among various parties existed, "to perform various functions in order to carry out the objectives of the conspiracy." (*Jasso,*

28

*supra*, 142 Cal.App.4th 1213, 1220.)  The nature of these agreements necessarily evolved over time, in response to different circumstances such as the interception of packages and the transfer of Michael between jail facilities.  (*Meneses, supra*, 165 Cal.App.4th 1648, 1669-1671.)  The five shipments had many similarities but also many differences, and the jury could reasonably have concluded that independent agreements were formed each time a shipment was planned and executed.  (*Id.* at p. 1669.)  There was no substantial evidence in support of the alternative finding as urged by Cristina.

In any case, jury instructions are not considered in isolation, and their adequacy is determined by consideration of the entire charge to the jury.  (*People v. Holt, supra*, 15 Cal.4th 619, 677.)  The jury instructions as given covered the nature of the required agreement between the codefendants, or other unknown individuals, to commit the crime of giving a controlled substance to a person in custody.  The jury was told to decide each charge separately, and it filled out five separate verdict forms on the conspiracy charges.  The instructions thus adequately presented the issue of how many conspiracies were represented in the evidence, without any need for an additional sua sponte instruction.

Due to the lack of error in the instructions given on conspiracy, we need not reach Cristina's arguments about the application of harmless error theory or federal constitutional standards for evaluating such alleged error.  (*People v. Watson*, *supra*, 46 Cal.2d 818, 836; *Chapman v. California*, *supra*, 386 U.S. 18, 24.)

### B.  Sufficiency of Evidence

In evaluating this claim of insufficiency of the evidence to support each of the conspiracy convictions, this court views the evidence in the light most favorable to the

29

prosecution, and we presume, in support of the judgment, the existence of each fact that the jury could reasonably have deduced from the evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

Cristina cites and applies the factors laid out in *People v. McLead, supra*, 225 Cal.App.3d 906, 920, for considering how many conspiracies were proven. She would conclude that each of the agreements to make shipments into jail involved the same motive, " 'were to occur in the same time and place and by the same means,' " and targeted the same audience (inmates in the jail population). (*Meneses, supra*, 165 Cal.App.4th 1648, 1672.) In particular, she contends that all the taped jail telephone calls seem to involve a prearranged set of code words about drugs and the methods and the contact persons to be used for smuggling, albeit on a continuing basis.

Our analysis of the evidence is different from Cristina's. The jury could reasonably have deduced from the evidence that Cristina and Michael's many taped conversations with each other, and Cristina's conversations with representatives of Michael, created and adapted separate agreements to accomplish the targeted offenses, according to the changing circumstances. While Michael was confined at the George Bailey facility, he had local confederates who cooperated with him, and different forms of packaging were used, including legal mail. As those packages were intercepted, other methods were developed, such as use of duck photo mailers and shipments of books, some with pages glued together with heroin. When Michael was located in Vista, there were not as many phone calls involving other cooperating participants or addressees. During the overall eight or nine month period that the shipments were going on, different

30

means were used, including different messengers, instructions and methods of packaging. Some, but not all, of the phone calls suggested there was a jail employee who might be involved ("24 hour postal place").

Finally, the jury did not accept Cristina's defense that she did not understand what substances she was repeatedly shipping into the jail. Sufficient evidence supports all five conspiracy convictions.

## DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


McDONALD, J.


McINTYRE, J.

31